### Mary McMULLAN et al.

v.

### The Hon. Dick THORNBURGH.

#### Civ. A. No. 79–3431.

United States District Court,
E. D. Pennsylvania.

March 4, 1981.

John M. Gallagher, Jr., Richard, Brian, DiSanti & Hamilton, Media, Pa., for plaintiffs.

William J. Taylor, Mark E. Squires, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

Jay M. Goldstein, Upper Darby, Pa., for intervenor-defendants.

OPINION *

LOUIS H. POLLAK, District Judge.

This proceeding commenced in 1979 and was an application brought by numerous persons who had served as local registrars within the Pennsylvania Department of Health, until they were discharged by the Secretary effective September 11, 1979, for reinstatement in the positions from which they had been discharged. The principal ground for the lawsuit was the contention under Section 1983 of Title 42 of the United States Code that the discharges violated the constitutional rights of the several plaintiffs in that they had been removed from their public offices for the reason that they were Democrats and that such a ground for removal was a transgression of the plaintiffs' rights to untrammeled political association as most particularly recognized by the Supreme Court of the United States in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and reaffirmed by the Supreme Court, several months after this litigation was commenced, in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

A secondary ground for the plaintiffs' lawsuit was an allegation that the discharge without a hearing was, as to each of the plaintiffs, a denial of procedural due process rights in contravention of the Fourteenth Amendment. A tertiary ground was that as a matter of Pennsylvania state law the plaintiffs could not be discharged except "for cause" under the Commonwealth statute which provides the legislative rubric for local registrars, namely, Act No. 66, designated the Vital Statistics Law of 1953, and no such cause as the statute contemplated was demonstrated by the discharging authority, Secretary of Health Gordon K. MacLeod. These secondary and tertiary claims have not been pressed in the course of the proceeding which has focused on the claims arising under *Elrod*.

---

* This opinion is a modestly-edited version of the transcript of my bench opinion of December 5, 1980. One purpose of the editing has been to eliminate (a) typographical and punctuation errors, and (b) mistakes of syntax. A second purpose has been to clarify obscure passages by excision and/or amendment. To the extent of the editing, this version, and not the bench opinion as transcribed, constitutes my ruling.

What commenced as an application for a preliminary injunction was translated on the court's motion into an application for a permanent injunction. Since the inception of this litigation, numerous defendants have been added at the instance of the court, those defendants being the persons who have been appointed to the various local registrarships made vacant by the discharge of the several plaintiffs. I pressed for the addition of these parties defendant because it appeared that in fact, whether or not in law, the incumbents who have now held the positions of local registrars since September of 1979 had a strong interest in the outcome of this litigation which ought to be protected to the extent possible by their inclusion in the proceedings going forward in this courtroom.

In the Spring of 1979, shortly after Governor Thornburgh's administration came into power in Harrisburg, the Pennsylvania Department of Health produced an extended study of the system of vital statistics governed by the Department of Health. That report, made to Deputy Secretary Welch and dated April 24, 1979, focused specifically on the system of local registrars established by Act No. 66. Under Act No. 66, local registrars appointed by the Secretary of Health for each registration district throughout the state are responsible for the filing of birth certificates and of death certificates and the issuance of burial permits. In those situations where there is a question as to the cause of death as, for example, where no physician was in attendance in the context of the last illness or where the circumstances surrounding the death suggests violence or other suspicious activity, local registrars are responsible for notifying the coroner so that appropriate inquiry can be made. And the registrars, of course, are also responsible for seeing to it that copies of the certificates are transmitted to the Department of Health for central record keeping.

Local registrars are compensated on a fee basis per certificate filed. When Act No. 66 was enacted the fee was 50 cents per certificate. The fee has now risen to a dollar per certificate. There is a statutory ceiling of $20,000 on the amount which any single local registrar may be compensated; and there are substantial variations in the actual amount of compensation for the not surprising reason that different registration areas have enough differences in population so that the numbers of births and deaths to be recorded and certified vary so significantly as to produce quite different amounts of compensation.

It is, therefore, the fact that among the group of plaintiff former registrars, compensation in 1978, the last full year in which the plaintiffs served in their official posts, ranged from the statutory high of $20,000 down to a low of $4,300.30. The local registrars—these plaintiffs and local registrars generally—have Social Security deductions taken out of their compensation and W-2 forms are filled out by the Commonwealth. They are within the embrace of the workmen's compensation system, though it appears the matter was somewhat in dispute as little as a year ago. They also seem to be covered by unemployment compensation.

■ I mention these facts because whatever ambiguity there may have been as to the employee-versus-independent-contractor status of persons occupying the post of local registrar seems to be resolved in favor of employee status. The possibility that these persons are not employees within the contemplation of *Elrod* and *Branti* is not something which has been pressed by defense counsel in this matter. To the extent that the issue is thought not to be at rest, I will say here that I conclude as a matter of law that the plaintiffs are employees of the Commonwealth within the meaning of *Elrod* and *Branti*.

We proceed, therefore, to the facts which give focus to the *Elrod* and *Branti* claims. As I have said, in the spring of 1979 the Department of Health inquired into the operation of the registrar system. The consequent report concludes that the existing system is uneconomical, not particularly efficient, and handicapped by the fact that, by and large, persons have been, under time-worn Commonwealth political tradi-

tion, appointed to the posts of local registrars as rewards for loyal political work—that is to say, the local registrar system has been regarded as part of Pennsylvania's patronage tradition. The record in this case as a whole confirms that perception of the registrar system.

The report considers three options: one, is to retain the existing system with its handicaps; the second is to retain the system and replace current registrars—current, that is, as of April 1979—with new appointees; and the third is to restructure the system with a view to having the entire registration process carried on by full-time Health Department personnel in regional offices, which number of offices would probably be increased and perhaps enlarged. The recommendation was against retention of the existing system and it was against retention of the existing system with new appointees.

The second option was thought to involve (1) considerable costs in the payment of substantial unemployment compensation for the persons to be discharged, and (2), as the report puts it, the "continued existence of a highly political, difficult to control system," which was a feature of the existing system noted under the first option. So the report opted for the third proposed reform, that is to say, abolition of the existing local registrar system and placing the whole process of registration, certificate filing and distribution, and data collection under the jurisdiction of full-time Department of Health personnel.

In the summer of 1979 some political pressure, most especially from persons of local political consequence in Delaware and Montgomery Counties, was, according to various Philadelphia area newspapers, being applied in Harrisburg, with a view to replacing local registrars of Democratic sponsorship with loyal Republicans. The press reports indicate that Murray Dickman, Deputy Executive Assistant to the Governor, met on at least one occasion with some of these political personages. Mr. Dickman in his testimony in this court was quite forthright about his very substantial involvement in the entire matter of terminating the several local registrars who were terminated as of September 1979, including these plaintiffs.

Mr. Dickman, as Deputy Executive Assistant to the Governor, was not the formal discharging authority. But, as a senior aide to the Governor, he was in a position, and, indeed, it was part of his appropriate function, to be representing the Governor's wishes in conversations and consultations and memoranda involving the statutory hiring and firing authorities in the Department of Health, the Secretary and Deputy Secretary.

In August of 1979, thirteen local registrars in Delaware and Montgomery Counties received letters dated August 28, 1979, one of which, that written to Mrs. McMullan, I will read into the record. The signing authority is Gordon K. MacLeon, M.D., the Secretary of Health.

Dear Mrs. McMullan: This is to advise you that your commission as Local Registrar of Vital Statistics is revoked, effective at the close of business September 11, 1979. Your replacement will be Mrs. Marie E. Rhoads, Apartment 8–A, 4800 Township Line Road, Drexel Hill, Pennsylvania, 19026.

Upon Mrs. Rhoads' request, you are instructed to turn over to her all accumulated registered copies of birth, death and fetal death (stillbirth) certificates, with all forms and supplies pertaining to registration, including certified copy death books Nos. 1212301, 1216001, 1228001, 1241001 and 1242801.

Kindly forward any original birth, death and fetal death certificates you may have on hand at the close of business September 11th in the regular envelope provided for this purpose. Payment will be arranged as soon as possible after completion of a check of the returns for the last month of your service.

Sincerely, Gordon K. MacLeod.

All of the persons who received this cordial letter were Democrats. All of those named to replace the addressees of these letters were Republicans.

Not surprisingly, there was some journalistic inquiry and comment subsequent to the discharge of the registrars. On September 6, *The Delaware County Daily Times* reported a telephone interview with the Governor. The Governor's words as quoted by Harold Ellis of the *Times*' Harrisburg Bureau, the author of the news report, were preceded by the following language of Mr. Ellis: "In contradiction of previous vows to do away with the patronage system, Republican Governor Dick Thornburgh Wednesday appeared to serve notice he wants to get as many active Democrats as possible out of state government.

"Thornburgh gave the warning in defending the replacement last week of 13 Democratic Party workers with 13 Republic Party workers as Registrars of Vital Statistics in Delaware and Montgomery Counties.

" 'I do not propose to subsidize [with] public funds the political activity of people dedicated to undermining this administration,' Thornburgh said in an exclusive telephone interview with the Daily Times."

Later on in the column the Governor is quoted as saying: " 'Right now we have mostly active members of the opposite party who are dedicated to undermining this administration. Rather than subsidize these activities with public funds, we are replacing some of them with qualified Republicans.' "

At a later point in the article the reporter reports that, "Thornburgh was confident the *Elrod* decision doesn't apply to the registrars.

" 'There's no constitutional right to hold a contract with the State.' "

*The Philadelphia Inquirer*, on September 9, under the by-line of Vernon Loeb, published a further dispatch from Harrisburg attributing a number of remarks to Mr. Dickman. " 'Our concern was not so much eliminating patronage but eliminating abuses,' Dickman said. 'It is not our intention to fund either party from the public coffers,

and that particularly goes for the Democrats.'

" 'I don't know how we are going to do it, but we are going to look at a reform of the system,' Dickman said. 'It's the kind of thing where you are damned if you do and damned if you don't.' " [1]

The two attributions to Mr. Dickman and Governor Thornburgh were chronologically between the dispatch of the letter of discharge of August 28 and its effective date, namely, September 11.

On October 2 the Governor addressed the Legislature, describing his legislative program. In the course of his address the Governor mentioned as one of the matters to which he attached importance—this is at page 14 of the Governor's statement as published—"Reform of our system of Local Registrars of Vital Statistics." And in the far more detailed "Legislative Agenda for 1979 to 1980" which the Governor transmitted with his address, the Governor had this to say: "The personnel system of state government calls for improvement. For example, I have asked the Department of Health to develop a proposal to do away with the antiquated system of Registrars of Vital Statistics. The administration proposal will be presented at the Legislature later in this session."

Indeed, a legislative proposal was presented to the Legislature later in the session. That legislative proposal is still pending (except that the Legislature has itself, I think, now finally adjourned for this session). The legislative proposal involves some modification in language of Act No. 66, and the proposal has been characterized by those familiar with its genesis and its legislative progress as one which would give authority to the Department of Health to abolish the existing registrar system and to bring about a restructuring somewhat along the lines of option three of the April 1979 Department of Health report to which I have referred.

---

1. While there is no proof, other than these newspaper quotations, that the Governor and Mr. Dickman actually uttered these words, I conclude that I have no basis for doubting that the reporters were substantially correct in relating remarks whose authenticity has not, on this record, been challenged by the officials in question.

There may well be an open question as to whether legislation is required to accomplish such a restructuring, but that hardly is a question before me. The question which has been urged upon me as something that is appropriate to consider is whether the legislative proposal put before the Legislature in the context of the discharge of registrars who are Democrats and their replacement with Republicans could be said to have been a seriously-thought-out, likely-to-succeed, avenue to reform.

In effect, Mr. Dickman has urged on this court in testimony, and defense counsel has placed great weight on this as a matter of defense, that it is the position of the Thornburgh administration that replacing Democratic registrars with Republican registrars will reduce the interest of Democratic legislators in preserving the existing registrar system since it will, from a Democratic perspective, have lost any particular patronage allure. That accomplishment will, in turn, facilitate, so the contention is, persuading the Legislature as a whole to support Governor Thornburgh's intended reform of restructuring the system by abolition of the existing local registrar structure.

In short, the view is that Governor Thornburgh can reasonably rely on the support of legislators of his own party but operates under the constant drum-fire of strong Democratic opposition—and particularly in a period when one or another or both chambers of the Legislature are in Democratic hands—to reforms which the Governor might want to undertake. So the strategy here was to reduce any significant political investment which the Democrats might have in the local registrar system and thereby create a situation in which the Governor could count on Democrats to be indifferent and Republicans to be supportive—and thereby accomplish his intended reform.

I refer to this at length because, in turn, plaintiffs have urged upon me that such a political strategy is a counsel of the most extraordinary political fragility. In effect, their view is: Why should Democratic legislators be dazzled by so obvious a stratagem

and ultimately lend themselves to a form of political suicide? The issue, though an intriguing one, is hardly of a sort one would want a court to explore, and I have no intention of exploring it further for its resolution is not necessary to the disposition of this case.

It will be apparent, I think, from what I have said up to now that the position of the defense in this case does not controvert the allegation that the plaintiffs, and, indeed, all other local registrars, discharged pursuant to the letter of August 28, were Democrats, and all their replacements were Republicans. On the contrary, defendant acquiesces in this view of the record, which is essentially indisputable, but argues, as I have tried to indicate, that the political affiliation of those discharged was relevant for the reason, and only for the reason, that the Governor and Mr. Dickman and those others helping the Governor in the management of the State's affairs were undertaking through these initial discharges to launch a process which would bring about the long-term reform of the registrar system along the lines suggested almost immediately thereafter by the Governor's address to the Legislature on October 2nd.

Against that, the plaintiffs' position is, in effect, that all the talk about firing Democrats in order to lubricate a reform process is a charade. We have to conclude, the plaintiffs suggest, that the actions taken after September 11, including the address to the Legislature and the filing of a proposed reform bill, were cosmetics which were initiated by the state administration with a view to facilitating defense against this very litigation.

I do not find myself persuaded by either the plaintiffs' view or the defendant's view of the factual record. It seems to me apparent, on the one hand, that plaintiffs are right in inferring from the facts of record that the Governor's people and, indeed, the Governor himself, were aware of the 'political,' in the partisan sense, implications of the local registrar system as it was in the summer of 1979 up to July—the point at which no firm decisions had been made but

after which decisions were very quickly made respecting the discharge of registrars in Montgomery and Delaware Counties. Plaintiffs were Democrats who were appointed to office by the last administration, that of Governor Shapp, and I think it apparent from the press clippings to which I have referred that Mr. Dickman and the Governor were aware of the fact that Democrats were being replaced with Republicans and that that was perceivable as part of a strategy not to continue to fund persons found to be in political opposition.

At the same time, the plaintiffs' perception that the whole reform program was a sham seems to me to be quite clearly contradicted by the fact that, as early as April of 1979, before political leaders in Montgomery and Delaware Counties were beseeching Harrisburg to make room for loyal Republicans in registrarships, the Department of Health, with a view to advising Mr. Dickman and others around the Governor, was seriously exploring the perceived inefficiencies in the existing registrar structure. And I fully credit Mr. Dickman's testimony that it was his understanding as he learned more and more about the registrar arrangements that macing and related political customs involving strong pressures for financial contributions to the party by incumbent office holders were rife among local registrars in general and particularly in Delaware and Montgomery Counties.[2]

My view of the record—and I find this as a fact—is that the discharges memorialized in the letters of August 28 and taking effect on September 11 were discharges which took into account political considerations in the conventional partisan sense but also were perceived by Mr. Dickman and the Governor as a first step in a reform program of substantial dimension.

In saying that the discharges took into account partisan considerations, I mean, of

course, that those determining on the discharges were aware of the fact that those being discharged were, in the main, Democratic loyalists who were to be replaced by Republican loyalists and that such replacements would clearly be welcomed by local political leaders. In saying that this was also understood by the Governor and Mr. Dickman to be the first step of a major reform program, I mean that the Governor and Mr. Dickman felt in all honesty that an important reform of governmental structure could be facilitated by a process of discharging local registrars, beginning with Democratic office holders.

With that factual predicate, what is the consequence mandated by *Elrod* and *Branti*? The plaintiffs' perception of the facts necessarily leads to a legal conclusion that the discharges were wrongful, that is to say, that they were discharges which were political in the conventional sense clearly at issue in *Elrod* itself and in *Branti*. Under the defendants' perception of the facts, these were not political firings in any sense contemplated by *Elrod* and *Branti* and, indeed, clearly fell outside of the teaching of those cases because those cases insist that political motivation be the "sole cause" of an actionable discharge.

To take the language of Judge Troutman in his recent decision, *Farkas v. Thornburgh*, 493 F.Supp. 1168, 1174 (E.D.Pa.1980) *aff'd mem.*, 633 F.2d 209 (3d Cir. 1981):

> A political firing violates the interdictions of the First Amendment only when the employing authority dismisses an employee '*solely* for political reasons.' *Branti v. Finkel* [445 U.S. 507], 100 S.Ct. at 1301, *Elrod v. Burns*, 427 U.S. at 350 [96 S.Ct. at 2678]. In other words, an independent justification coupled with a constitutionally flawed reason will not taint the Secretary's decision to terminate plaintiffs' employment. *See Mt. Healthy Board of*

---

2. I do not make a finding of fact that those practices were, in fact, common in Delaware and Montgomery Counties, let alone that they were more virulent there than elsewhere; nor do I make a finding of fact the other way. The extent of my finding is simply that it was Mr. Dickman's honest perception that local registrars, especially in Delaware and Montgomery Counties, and particularly including the plaintiffs, felt under party pressure to give and did customarily give some measure of financial support to the Democratic Party if they were registered Democrats.

*Education v. Doyle*, 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471] (1977).

Of course, in defendants' view of the record there was no "constitutionally flawed reason" coupled with an "independent justification." There was merely the "independent justification"—the reform program of the Governor.

In the middle view of the facts which I take, there are two concurrent animating factors: partisan political advantage in the conventional sense *and* the Governor's re*form program*. I will not undertake to determine which of the two was paramount in some quantifiable sense. I think both were operative. I would simply say that it is not, in the nature of things, surprising that in governmental activity one gets two motivations operating concurrently.

In *Village of Arlington Heights v. Metropolitan Housing Development*, the Court said, through Mr. Justice Powell:

Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.

429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

Defendants insist, however, that *Elrod* and *Branti* focus on the soleness of political motivation as the only operative ground for a plaintiff's success and, indeed, the cases certainly are supportive of that proposition. In *Branti*, Mr. Justice Stevens said this:

To prevail in this type of an action, it was sufficient, as *Elrod* holds, for respondents to prove that they were discharged 'solely for the reason that they were not affiliated with or sponsored by the Democratic Party.'

445 U.S. 507, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980), *quoting Elrod v. Burns*, 427 U.S. 347, 350, 96 S.Ct. 2673, 2678, 49 L.Ed.2d 547 (1976).

Let me for the moment, though, address the legal issue on the factual assumption urged by defendant—which, as I have indicated, I reject—that the only operative motivation behind the discharge was the Governor's reform program. In that view of the matter, the defendant urges that the political affiliation of the plaintiffs, though taken into account, was simply an instrument to the large reform end and, therefore, so defendant says, we do not have a situation in which the political affiliation of the plaintiffs was the sole cause for discharge. The cause for discharge in the large sense was the Governor's reform plan, so defendant's argument runs, on the basis of defendant's perception of the record. And taking, *arguendo*, that perception of the record, I want to examine that proposed legal conclusion.

The legal conclusion fails. The legal conclusion—and I would now go back to Judge Troutman's analysis—depends on the proposition that "an independent justification coupled with a constitutionally flawed reason will not taint the Secretary's decision to terminate plaintiffs' employment." *Farkas, supra*, 493 F.Supp. at 1174.

■ It is my judgment that what we have here is not an independent justification coupled with a constitutionally flawed reason. What we have is an independent justification which rests upon the constitutionally flawed reason of political affiliation. *Mt. Healthy* teaches:

A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred.

429 U.S. 274, 285, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977).

Justice Rehnquist, who spoke for the Court in *Mt. Healthy*, quite understandably rejects a rule so constructed and comes to a different rule, which is the rule that governs the decision in this case:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (note omitted).

The protected conduct in this case is membership in the Democratic Party. It is clear from this record, even on defendant's perception of the facts, that plaintiffs' membership in the Democratic Party was an essential ingredient in the decision to discharge. Had the plaintiffs not been Democrats, it is clear that the plaintiffs would not have been discharged.

Even the assumption that the Governor's laudable reform purpose was the *only* purpose which, in an ultimate sense, animated the discharges does not, in my view, bring this case within the purview of the *Mt. Healthy* dictum, for the reason that the membership of the plaintiffs in the Democratic Party was an integral part of the set of ingredients which led to their discharge.

Defendant makes the further contention that a discharge is not constitutionally flawed unless there is an intention on the part of the discharging authority to prejudice the constitutional rights of the plain-

tiffs; that is to say, the defendant's view is that a discharge of Democrats in which the political affiliation of the Democratic dischargees was only incidental to the larger purpose of creating a climate in which reform could be accomplished is not a discharge which in any way manifests the Thornburgh administration's hostility to the political purposes and interests of the plaintiffs themselves.

█ Since I credit the good faith of the Governor,[3] I have no reason to suppose that the Governor and Mr. Dickman were themselves interested in any narrow political sense in interfering with the political activity of the plaintiffs as individuals. But I think the defendant's legal contention that the intentionality which will create a constitutionally flawed discharge must be an intentionality designed to interfere with the constitutional rights of the plaintiffs is a misconception of what the cases prescribe.

It is true that in *Mt. Healthy* there is reference [4] to language in *Village of Arlington Heights* which might be understood in the sense that defendant contemplates. Within the context of the Court's discussion of the notion of a "substantial" or "motivating" factor there is a reference to footnote 21 in *Village of Arlington Heights*. Footnote 21 reads:

> Proof that the decision by the Village was motivated in part by a radically discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of the discriminatory purpose. In such cir-

3. My finding, as I have said above, is that reform was only one of two animating purposes. But I want to make it entirely clear that in my perception of the record as one which demonstrates a decision to which both political considerations of the conventional partisan kind and political considerations of a much

higher statesmanlike kind contributed, I see no reason not to credit the good faith of the Governor and those planning with him for the long-term reconstruction of the Department of Health.

4. 424 U.S. at 287 n.2, 97 S.Ct. at 576 n.2.

cumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing. See, *Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471].

429 U.S. 252, 270 n.21, 97 S.Ct. 555, 566 n.21, 50 L.Ed.2d 450.

Defendant's argument essentially is that, by the reference to *Village of Arlington Heights,* the *Mt. Healthy* opinion intended to import into the *Mt. Healthy/Elrod* rubric something cognate with a requirement of a "racially discriminatory purpose" before a discharge could be actionable. It is understandable that the reference can create ambiguities, because in the text of *Village of Arlington Heights* there is considerable discussion by the Court of the requirement in a racial discrimination case of demonstrating that the discrimination complained of was intentional, or that, to use the Supreme Court's language, "invidious discriminatory purpose was a motivating factor ...." *Village of Arlington Heights,* 424 U.S. at 270, 97 S.Ct. at 566. One can, I think, find

some aura in the term "invidious discriminatory purpose" of an intimation by the Supreme Court that what is necessary in a racial context is a determination that the complained-of state action was not merely racially discriminatory but that it was intended to be so, that is to say, that there was not merely a racial differentiation but that it was a racial differentiation which was made with a hostile eye.

It is my reading of the race discrimination cases that that would be a misconstruction of what the Supreme Court has had in mind. I think the Supreme Court has had in mind only to say that racial discrimination by the State is actionable under the Fourteenth Amendment only if the record demonstrates intentionality in racial differentiation.[5]

I went into this excursus at some length both because the Supreme Court has cross-referenced *Mt. Healthy* and *Village of Arlington Heights,* two cases decided on the same day, and because Governor Thornburgh has relied importantly on the proposition that he was in no sense activated by any political hostility, in the ordinary partisan sense, to the plaintiffs, in authorizing

---

5. What was particularly at issue in the Supreme Court's discussion in *Village of Arlington Heights* was the difference between racially disproportionate impact and racially discriminatory purpose. Much of the case was a reprise of the Supreme Court's decision the previous term in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which had explored that very differentiation. *Compare Village of Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 562, *with Washington,* 426 U.S. at 239, 96 S.Ct. at 2047, *et seq.* I do not read *Washington v. Davis* or *Village of Arlington Heights* as meaning to require more than intentionality before racial differentiation becomes actionable. The pertinent thrust of *Washington v. Davis,* as it reversed the Court of Appeals for the District of Columbia, was simply to reject the proposition that a governmental program's disproportionately adverse impact on a racial minority was sufficient to bring it within the interdiction of the equal protection clause, whether or not there was a demonstration of intentionality on the part of government officers to bring about that disproportionate impact. *Compare, Davis v. Washington,* 512 F.2d 956, 960–61 (D.C.Cir.1975). It is my understanding of the Supreme Court's cases in the race field that where an official state policy

operates explicitly on a racial basis, that by itself at least makes the program constitutionally suspect without any inquiry into the evilness of the purpose of the discrimination. For example, in *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) which Mr. Justice White discussed, *inter alia,* in *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049, the Supreme Court's invalidation of Florida's laws, imposing a heavier penalty on unmarried cohabitation between persons who were of different races than on unmarried cohabitation between persons of the same race, depended in no way on a demonstration that Florida's statute was intended to be in some way hostile to blacks or to whites. So, too, in its cases dealing with segregation in public schools—the cases which, of course, comprise the mainstream of racial discrimination law— the Court has not hesitated to invalidate a pupil assignment statute simply because the statute may have been represented by its sponsors as intended to protect rather than to oppress the black children who were being assigned to schools on a racial basis. Good faith, after all, was part of the unsuccessful defense in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) itself.

their discharge. I take the Governor's good faith as a given. But I take the rule of *Elrod* and of *Branti* to be that a governmental decision to discharge public officials, which takes as its predicate their political affiliation, is one which is inconsistent with the First Amendment.[6] It is for these reasons that I conclude that the discharges of these plaintiffs—which discharges were predicated on their political affiliation as Democrats, and on the Republican affiliation of those who would replace them—are constitutionally flawed within the meaning of *Elrod* and *Branti*.

■ There may seem to be some anomaly in a conclusion that persons who came to hold public office on the basis—apart from their assured qualifications for their posts (which posts they have on this record filled faithfully and productively)—of appointment by Governor Shapp as good Democrats, should now be in a position to say to Governor Thornburgh and his administration, "You shall not discharge us on the ground that we are Democrats, notwithstanding that we were appointed to our current positions with that as one of our necessary qualifications." If there is anomaly here, it is built into the constitutional transition which *Elrod* and *Branti* have effectuated between the politics which America has grown up with and the more protected political environment which the First Amendment, pursuant to *Elrod* and *Branti*, now instructs government officials, both federal and state, to establish and maintain.

*Elrod* and *Branti* are very recent decisions and we are, as a Commonwealth and as a nation, in the process of adjusting to them now; a case of this kind is an element in that accommodation.

■ Now, the legal conclusion that I have reached means, in my view, that plaintiffs are entitled to an order of reinstatement. Defendant has urged that there is no judicial power to reinstate where the position from which one has been dis-charged has been filled. In making this argument, defendant relies heavily on a sentence in a recent Fourth Circuit opinion: "Moreover, without the [preliminary] injunction, the government would be free to name a successor to Johnson . . . and Johnson would have no means of being reinstated if he should prevail at trial." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978). Just what the Fourth Circuit meant by this unelaborated dictum is not clear; the one thing that is clear is that it could not have been intended as a general foreclosure of judicial power to direct reinstatement, since exactly that remedy was sought by the plaintiffs whose cause of action the Supreme Court held to be viable in *Elrod*. See, *Burns v. Elrod*, 509 F.2d 1133, 1135 (7th Cir. 1975).

I do appreciate that in this case it has been urged by Governor Thornburgh and by the intervening defendants, the present incumbent registrars, that Pennsylvania state law permits only one person to be a local registrar at a time in a given region. I'm willing to assume that that is the case and that assumption carries with it the real possibility that an order from this court directing reinstatement of these plaintiffs might result in the dismissal of the current incumbents—persons who are certainly entirely guiltless and have doubtless been performing their duties faithfully and efficiently. But I find no basis for preferring the rights of the now incumbents to the rights of the plaintiffs who, as I perceive the facts and the law in this case, have been deprived of their official positions for the prohibited reason that they are Democrats.

I do not propose in the order of reinstatement which I would make to direct the discharge of those persons who are now incumbents. If that is the consequence of my reinstatement order, that will follow as a matter of Commonwealth determination, not as a matter either of the intention or of the inclination of this court. On the con-

---

**6.** This excepts that small group of public officeholders as to whom the Supreme Court has held that their hiring or retention can be geared to political affiliation, given a demonstration— not urged here—that political affiliation serves some substantial governmental purpose attaching to the public office in question. *Branti*, 100 S.Ct. at 1295.

trary, I would very much hope that the Governor and his administrative colleagues would do their very best to limit the injury to these incumbents who have been performing public service at the instance of the Governor's subordinates since their appointment to the registrarships in September of 1979. But that, as I say, is not a matter before me except to conclude, as I do conclude, that the very real interest that those defendant incumbents have in continuing in office is not an interest which is superior or even equivalent in law to the claim that these plaintiffs have to an order of reinstatement.