Patricia HORN, et al., Plaintiffs,

v.

Thomas KEAN, etc. et al., Defendants.

Civ. A. No. 82–2964.

United States District Court, D. New Jersey. Civil Division.

Sept. 27, 1984.

Dennis O'Leary, Sussex, N.J., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Andrea M. Silkowitz, Deputy Atty. Gen., Trenton, for defendants.

## OPINION

BARRY, District Judge.

This is an action, pursuant to 42 U.S.C. § 1983 and other sections of the civil rights laws, brought by a number of former New Jersey motor vehicle agents who are members of the Democratic party[1] and were appointed as agents during the administration of Governor Brendon Byrne. Plaintiffs argue that their replacement with members of the Republican party by the

---

administration of Governor Thomas Kean, in the fall of 1982, was wholly motivated by political animus in violation of plaintiffs' First, Fifth and Fourteenth Amendment Rights. They claim the protection of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), asserting that they were public employees who could not be removed solely because of their political affiliation. Injunctive relief and compensatory and punitive damages are sought.

Defendants Governor Kean, Attorney General Irwin I. Kimmelman, and Director of the Department of Motor Vehicles ("DMV") Clifford Snedeker, contesting plaintiffs' characterization of their former status as that of "public employees" and, thus, rejecting their claim of *Elrod* and *Branti* protection, have moved for summary judgment. The parties agree that there is no genuine issue of material fact in dispute and that disposition on summary judgment is appropriate. *See* Federal Rule of Civil Procedure 56(e); *Adickes v. S.H. Kress,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The question of whether plaintiffs were public employees and, therefore, protected from dismissal solely because of their party affiliation, is a question of ultimate fact, see *Helvering v. Tex-Penn Oil Co.,* 300 U.S. 481, 491, 57 S.Ct. 569, 573–74, 81 L.Ed. 755 (1937), that becomes a question of law for the court to determine. *See McMullan v. Thornburgh,* 508 F.Supp. 1044, 1046 (E.D.Pa.1981).[2] For

---

1. The Complaint in this action, filed September 2, 1982, and the Amended Complaint, filed September 14, 1982, named as plaintiffs four appointed motor vehicle agents (plaintiffs Horn, Olinsky, Tango and Munley), the wife of one appointed motor vehicle agent (plaintiff Reid), and the New Jersey Motor Vehicle Association which has, in the past, represented the interests of New Jersey motor vehicle agents. By a consent order entered June 6, 1983, eight additional former motor vehicle agents (Luberto, Littleford, Nemyo, Letz, Sweetwood, Webb, Clyde and Ianonne) were added as plaintiffs.

2. In contrast, the issue of whether a public employee has been terminated *because of his political affiliation,* in violation of the First

Amendment, is a question of material fact, which, if disputed, would preclude summary judgment. *See Gannon v. Daley,* 561 F.Supp. 1377, 1381 (N.D.Ill.1983). The employee alleging dismissal on the basis of affiliation with a political party need not prove, in order to maintain his or her cause of action under 42 U.S.C. § 1983, that political association or nonassociation was the sole reason for his or her discharge; rather it need only be shown that such political ties or a lack thereof was a "substantial" or motivating factor. *Mitman v. Glascott,* 557 F.Supp. 429, 431 (E.D.Pa.1983), *aff'd* 732 F.2d 146 (3d Cir.1984). Here, there is dispute as to whether political affiliation was the principal or sole cause for the termination of the agents; however, because I am led to the conclusion

the reasons which follow, defendants' motion will be granted.

\*     \*     \*

*Elrod* was a suit by Republican non-civil service employees of the Cook County, Illinois sheriff's office who were dismissed for failure to affiliate with or obtain the sponsorship of the Democratic Party after Democrat Richard Elrod was elected Sheriff. Plaintiffs contended that their dismissal was in violation of the First and Fourteenth Amendments. The district court dismissed the complaint, the Seventh Circuit reversed, and a divided Supreme Court affirmed.[3]

The plurality opinion emphasized that free political association is the very core of the First Amendment and that when that freedom is impinged by a coerced pledge of allegiance to a political party or other compelled orthodoxy, true beliefs are compromised. 427 U.S. at 355–356, 96 S.Ct. at 2680–2681. *Elrod* served to extend the holdings in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (New York statutes barring individuals from state employment because of membership in "subversive" organizations invalid) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (public school teacher may not be fired for exercising first amendment rights; state college teacher has property interest in his job and might be entitled to hearing under fourteenth amendment before he could be dismissed), in that it held that tethering government employment to partisan affiliation imposed an unconstitutional condition on receipt of a public benefit. 427 U.S. at 359, 96 S.Ct. at 2682.

The plurality balanced the suspect character of patronage dismissals against the purported, least restrictive, vital government end of ensuring against public employee lack of commitment and diligence because of sympathy with the party that is out of power and rejected the argument that efficiency was promoted by patronage dismissals. *Id.* at 364, 367, 96 S.Ct. at 2685, 2686. The prevailing justices concluded that permitting political dismissals of policy-making individuals sufficed to ensure that the policies of the party in power were not undercut because of partisanship on the part of public employees. *Id.* at 367–368, 96 S.Ct. at 2686–2687. These justices also refused to conclude that barring most patronage dismissals would result in the demise of party politics. *Id.* at 369, 96 S.Ct. at 2687.

What is of importance here is that the holding in *Elrod,* while recognizing that "political patronage comprises a broad range of activities," is expressly limited to "the constitutionality of dismissing public employees for partisan reasons." *Id.* at 353, 96 S.Ct. at 2680. Plaintiffs in *Elrod* included the Chief Deputy of the Process Division of the sheriff's office, a bailiff, a process server and an office employee. *Id.* at 350–351, 96 S.Ct. at 2678–2679. There is no hint that any of these individuals were not part of a mass of public employees, in the commonly accepted understanding of that phrase, who had been subject to partisan dismissal[4] or that they had anything

---

that plaintiffs were not public employees, and therefore, were not entitled to make use of the Supreme Court's protective shield, I need not reach the question of the precise role that politics played here. I note in passing, however, that to the extent that politics played a role in plaintiffs' replacement, it presumably played a role when plaintiffs replaced appointees of the Republican Cahill administration.

**3.** Justice Brennan wrote the plurality opinion, in which Justices White and Marshall joined. Justice Stewart, joined by Justice Blackmun, filed an opinion concurring in the judgment. The Chief Justice filed a dissenting opinion and Justice Powell filed another dissent joined by

the Chief Justice and Justice Rehnquist. Justice Stevens took no part in the consideration of the case. The holding in *Elrod* is necessarily limited to the basis of decision of the concurring justices. *Marks v. U.S.,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

**4.** Justice Powell, dissenting at 377, noted that the Cook County sheriff's office contained approximately 1500 people whose positions were normally awarded on the basis of political affiliation. Clearly, in *Elrod* the Court was concerned with the potential for a wholesale political purge and not the replacement of a few individuals in responsible positions.

resembling independent contractor status. Justice Stewart, concurring, emphasized that "This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations." *Id.* at 374, 96 S.Ct. at 2690.

In *Branti v. Finkel, supra,* the Court, while reaffirming the unconstitutionality of patronage dismissals, narrowed the *Elrod* policy maker exception to the general proscription against such dismissals. *Branti* arose from the planned dismissal of six of nine assistant public defenders in Rockland County, New York by a public defender who had been appointed by the Democratic-dominated county legislature. Two of those dismissed were Republicans, who filed suit to enjoin their dismissals. The district court, relying on *Elrod*, had granted the injunction and the Second Circuit had affirmed without opinion. In affirming, the Court, per Stevens, J., reformulated the *Elrod* policy maker exception, stating that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. It concluded that assistant public defenders did not fit into that exception. *Id.* at 519, 100 S.Ct. at 1295. While highly critical of the patronage system generally,[5] arguing that its benefits accrued only to the party in power and not to the government, the majority opinion again concerned only those who were obviously public employees.

With some exceptions, *Elrod-Branti* principles have been applied quite narrowly and have not been employed to curb other patronage personnel actions such as hirings, transfers, reassignments, demotions, and failures to promote. *See* Note, *First Amendment Limitations on Patronage Employment Practices,* 49 University of Chicago L.Rev. 181 (1982); *but see Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982); *Delong v. United States,* 621 F.2d 618, 623–24 (4th Cir.1980) (retribution short of discharge actionable). These principles have not been expanded to include protection for persons other than public employees, such as independent contractors, because sharp differences in the needs of public employees and contractors are perceived. *See LaFalce v. Houston,* 712 F.2d 292, 295 (7th Cir.1983) ("Some day the Supreme Court may extend the principle of its public-employee cases to contractors, but there are enough differences in the strength of the competing interests in the two classes of cases to persuade us not to attempt to do so."), *cert. denied,* —— U.S. ——, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984).[6]

\* \* \*

N.J.S.A. 39:3–3 provides that the Director of the Division of Motor Vehicles in the Department of Law and Public Safety

... shall designate at least 1 person in each county for each 300,000 inhabitants or fraction thereof to be his agent for the registering of motor vehicles, issuing registration certificates and licensing of drivers, subject to the requirements of this subtitle and to any rules and regulations the director imposes. The agent shall so act until his authority is revoked by the director. All moneys received by such agents for registrations and licens-

---

**5.** For a criticism of the Court's broadside against political patronage as unrealistic, see *Loughney v. Hickey,* 635 F.2d 1063, 1067–1070 (3rd Cir.1980) (Aldisert, J., concurring).

**6.** In *LaFalce,* the Seventh Circuit rejected the argument of a bidder on a contract to install city benches that his failure to receive the work because he had not supported the incumbent city mayor in a prior election violated the First Amendment. Similarly, in *Fox & Co. v. Schoe-*

*mehl,* 671 F.2d 303 (8th Cir.1982), an accounting firm's contention that it was dismissed from city auditor duties for political reasons in violation of the First Amendment was also given short shrift, the Eighth Circuit holding that the firm, which was hired to audit the books and records of a school board was not a "public employee" but, rather, an independent contractor and, therefore, could be denied the auditing contract solely because of its political affiliation.

es granted under the provisions of this chapter shall forthwith be deposited as received with the State Treasurer. The fee allowed the agent for registration certificates issued by him and for every license granted by him shall be fixed by the director on the basis of the registration or license fees collected by the agent. The director may limit the fee so paid to a maximum. Such fee shall be paid to the agent by the State Treasurer upon the voucher of the director in the same manner as other State expenses are paid.

Defendant Snedeker, in answer to interrogatories, stated that as of September, 1982 there were about fifty motor vehicle agents operating in New Jersey. Approximately nine of the agencies were acknowledged to be operated directly by employees of the DMV.[7] It is undisputed that plaintiffs' positions as "private" agents were "at-will" because they acknowledged, as a condition of employment, that they would retain their "appointment at the pleasure of the incumbent Director of the Division of Motor Vehicles and his successors." *See* Snedeker Aff. 9/82, Exh. C1–C5.

Each "privately operated" agency functions as a profit-making enterprise for the agent, with the state reimbursing agents for virtually all operating expenses, except wages, and guaranteeing a minimum net profit. Torlini Aff. at ¶¶ 4, 8. The agent, who is without Civil Service protection, is unsupervised with respect to the number, salary, hours and qualifications of his or her employees and the mode of their hiring, promotion or dismissal. The agent pays wages from his commissions and deducts his employees' state and federal withholding tax, unemployment tax, and FICA. *Id.* at ¶¶ 4, 8–9. The agent must obtain, at his own expense, a public performance bond to protect against the loss of monies collected,

as well as his own Workers' Compensation, theft and general liability insurance. However, the agent determines whether or not to provide health and pension benefits for his employees, since neither the agent nor his employees are eligible to participate in the State Health Benefits Program and state employee pension programs. *Id.* at 10. A tally of responses to interrogatories propounded by defendants reveals that only one plaintiff provided health and pension benefits to her employees.

Moreover, appointed agents are not required to be present in the agency during business hours and a large percentage of agency heads maintain other full-time employment by delegating day-to-day operational responsibilities to others. In 1982, only approximately one-half of the agencies were administered by the agents themselves. With reference to the five original individual plaintiffs, Torlini reports that

... only Ms. Horn is present in her agency on a full-time basis during its business hours. Thus, Mr. Tango's primary responsibilities during the day involve his insurance company. Mr. Olinsky retains full-time employment in New York as an Account Manager for Reuben H. Donnelly, a division of Dun & Bradstreet. Mr. Reid, who works in Delaware, has delegated his administrative responsibilities to his wife, Mary Jane Reid. Mr. Munley who heads the Washington agency is a high school teacher in Phillipsburg.

Torlini Aff. at ¶ 7. Field representatives of the DMV theoretically conduct weekly or biweekly on-site audits of the agencies' records, although answers to interrogatories indicate that months might pass without an audit. The DMV requires agents to submit daily reports of monies collected. *Id.* at ¶ 11. Torlini adds that

Beyond this the Division's supervisory role is limited to responding to inquiries

---

7. These numbers differ somewhat from those given by Assistant Director of the Division of Motor Vehicles Rudolph L. Torlini who, in an affidavit of September, 1982, states that there were then 49 agencies, of which 11 were "State operated agencies where the employees serve as temporary Civil Service employees." According

to Snedeker, by the end of 1982 all the agencies that had been "state operated" had been turned over to "private" operation, except one that had been closed. One previously "private" agency was also closed and two additional "private" agencies were opened.

from the agencies with regard to implementation of the motor vehicle laws and complaints from the public.

... Historically those motor vehicle agents not classified as temporary Civil Service employees have been viewed by this Division as independent entrepreneurs rather than as State employees. Their status has been so defined based upon the manner in which they have been compensated for their services and the autonomy they retain in the operation of their agencies.

*Id.* at ¶¶ 11–12.

A *Motor Vehicle Agent's Procedures Manual and Handbook,* published by the DMV, exists to guide agents in the performance of their duties. The last two editions bear the dates August 1982 and July 1984. Both editions of the manual are principally devoted to detailed information concerning the multitude of permits, licenses, certificates of ownership and registrations available for the variety of motor vehicles and drivers that are required by law to submit to state regulation. A few pages of the manual deal with suggestions concerning public relations.

The principal responsibility for preparing the manual devolved on Torlini although the DMV had a training officer who made and received suggestions. Recommendations were made as well by the motor vehicle agents and "... periodically, the agents will be interviewed to find out what they should change in here and recommendations, and the manual will be updated if we find it acceptable." Recommendations concerning summertime and evening hours of operations and agency cleanliness were among those discussed. Snedeker also met with agents to listen to their suggestions and recommendations concerning the Manual. (Snedeker Dep., 6/3/83, at 23–24.)

Plaintiffs rely principally upon *McMullan v. Thornburgh, supra,* to argue that they were public employees for *Elrod-Branti* purposes. The *McMullan* plaintiffs were a group of Democrats who had served as local registrars within the Pennsylvania Department of Health until dismissed by an incoming Republican administration. The local registrars were appointed by the Pennsylvania Secretary of Health and charged with the responsibility of filing birth certificates, issuing burial permits and notifying the coroner when an inquest was thought to be needed. The registrars were compensated on a fee basis per certificate filed, with a statutory ceiling on the amount of compensation per registrar. Social security deductions were taken out of this compensation, W–2 forms were filled out by the Commonwealth of Pennsylvania, and the registrars were within the scope of the Worker's Compensation system. Superficially, then, the local registrars bore a relationship to the state not entirely dissimilar to the relationship borne by plaintiffs in the case at bar.

However, *McMullan* is of rather limited utility here because "The possibility that these persons are not employees within the contemplation of *Elrod* and *Branti* is not something which has been pressed by defense counsel in this matter." 508 F.Supp. at 1046. A distinction of considerable importance between the *McMullan* registrars and plaintiffs here is that in *McMullan* there was a strict limit on profitability. While a ceiling on profits does not necessarily indicate that the operator is an employee rather a contractor, unlimited profits is certainly not the hallmark of public employment. Plaintiffs here were also not covered by the state's subscription to a Worker's Compensation scheme, unlike those in *McMullan.*

In an opinion letter dated March 17, 1980, Richard L. Crain, Chief of the Wage, Excise and Administrative Provisions Branch of the Internal Revenue Service, pronounced the agents and their employees to be employees of the State of New Jersey. In contrast, as early as December 15, 1954, the Attorney General of New Jersey issued Memorandum Opinion P–21, in response to an inquiry of the state's Secretary of Old Age and Survivor's Insurance concerning whether motor vehicle agents and other persons were properly coverable as state employees under the Federal So-

cial Security Act. The Attorney General concluded that "Motor vehicle agents and their employees are not properly coverable. They are not in State service. Motor vehicle agents are appointed pursuant to R.S. 39: 3–3. No provision is made under this legislation for employees of a motor vehicle agent."

Defendants correctly point out that the Internal Revenue Service issued what appears to be a conflicting ruling with respect to Missouri Department of Revenue fee agents. *See Joos v. Bond,* 526 F.Supp. 780, 783 (E.D.Mo.1981), *aff'd sub. nom. Sweeney v. Bond,* 669 F.2d 542 (8th Cir.1982), *cert. denied,* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982). The duties of the Missouri fee agent of issuing licenses and collecting taxes and fees are precisely those that plaintiffs in the instant matter had through their agencies. Defendants also assert that the IRS ruling reveals that that agency failed to apply the indices of a common law employer-employee relationship which are used to determine employee status for purposes of the F.I.C.A. *See* 26 U.S.C. § 3121(d); 26 C.F.R. § 31–3121(d)–1(c). At any rate, one's status as a public employee or an independent contractor is to be determined by state law. *See, for example, Laguana v. Guam Visitors Bureau,* 725 F.2d 519, 520 (9th Cir.1984) (determination, construing local law, that defendant not government instrumentality and plaintiff, therefore, not public employee for purposes of *Elrod-Branti* analysis).[8]

New Jersey courts have placed motor vehicle agents outside the pale of public employment and New Jersey law clearly militates against plaintiffs being considered to be public employees for purposes of *Elrod-Branti* analysis. In *Carluccio v. Ferber,* 18 N.J.Super. 473, 87 A.2d 439 (App.Div.1952), a former motor vehicle inspection agent sought restoration of his position on the ground that as a veteran he could not, under the Veterans' Tenure Act, be subject to at-will removal by the Director of Motor Vehicles. Judge, now Justice, Brennan held that "... an agent designated under R.S. 39:3–3 is not a person 'holding any employment, position or office under the government of this state' and 'receiving a salary from such state' within the intendment of the Veterans' Tenure Act." *Id.* at 476, 87 A.2d 439. He distinguished between motor vehicle inspectors, who had all the trappings of civil service appointments, and the motor vehicle agents, who

> ... may act only 'until his authority is revoked' by the Director, and his compensation is based upon registration certificates issued by him and for every license granted by him, and the Director has authority to limit the fee so paid to a maximum. The Legislature obviously intended to, and did, place in the hands of the Director large and unusual determinative powers, including the designation and removal, and the fixing of the number and the compensation of such agents. Plainly the agent is not within the class of persons in public service contemplated by the Legislature to be limited to persons holding 'employment, position or office' and 'receiving a salary from such state ...' The legislative intention was to give the Director full rein to control the tenure of his agents and to appoint and remove at his pleasure.

*Id.* at 477, 87 A.2d 439 (citations omitted).

This view of motor vehicle agents was recently reaffirmed in *In re Fitzgerald,* 188 N.J.Super. 476, 457 A.2d 1208 (App. Div.1983). There, an agent, who was dismissed shortly after the Kean administration took office, argued that because he was the holder of an "exempt fireman's certificate", his agency could not be revoked except for good cause, after a hearing. The threshold question was described as being "whether [the agent] holds an 'office, position or employment of the State' and thus is entitled to protection

---

**8.** *See also Tuveson v. Fla. Governor's Counc. on Indian Affairs,* 734 F.2d 730, 732 (11th Cir.1984) (in determining which political entities protected by Eleventh Amendment, state law creating and defining entity is examined); *Cannon v. Univ. of Health Sciences/The Chic. Med.,* 710 F.2d 351, 356 (7th Cir.1983) (same).

under the act." *Id.* at 478, 457 A.2d 1208. Rejecting that contention, the court concluded that "By their nature, motor vehicle agencies are independently run operations managed by independent contractors who are not subject to the benefits and protection of the State's pension and tenure statutes and who are remunerated on a commission basis." *Id.* at 482, 457 A.2d 1208.[9]

Of course, neither *Carluccio* nor *Fitzgerald* dealt with the question of whether motor vehicle agents are public employees for *Elrod-Branti* purposes. That question has only been addressed by *Sweeney v. Bond, supra.* The *Sweeney* plaintiffs were fee agents for the Missouri Department of Revenue, authorized by statute to issue licenses and collect taxes and fees on motor vehicles. They were appointed by the Director of Revenue and could be terminated by that official or his successor. The District Court in *Sweeney* noted that the Missouri Department of Revenue exercised a modicum of control over the general operations of the fee agent offices, but left management functions to the fee agents. The fee agents were required to deposit the money collected for taxes and fees in state accounts, but did not have to account for their own fees. They were, however, required to file accounting reports and bank statements and to obtain the approval of the Department of Revenue prior to relo-

cating. Business hours were those selected by the agent, but subject to the approval of the Department of Revenue. That Department trained fee agents and their employees and supplied their offices with an employee classified as a photographer/vision tester and with a set fee, long-distance telephone service (WATS line). Fee agent offices were listed under the Department's heading in telephone directories. *See Sweeney v. Bond,* 519 F.Supp. 124, 126 (E.D.Mo.1981), *aff'd* 669 F.2d 542 (8th Cir. 1982), *cert. denied* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

The Missouri fee agents were free to hire employees, the selection or retention of whom the state did not supervise. The agents were not required to work in their offices. Some of the *Sweeney* plaintiffs did work full-time in their agencies, others part-time, and still others not at all. The office locations were of the agents' choosing, but subject to Department approval, and agents paid their own operating expenses. Agents were not compensated by the state, but affixed a set fee per transaction. They paid self-employment taxes and were not members of the state retirement system. *Id.* at 126–127.

The District Court found that the agents were "not employees of the State of Missouri but are more in the nature of independent contractors or franchisees", and

**9.** Defendants argue that there is another indication of state law which cuts against plaintiffs being regarded as public employees, namely, that motor vehicle agents are not eligible for representation by the Attorney General of New Jersey or for indemnification in actions brought under the Tort Claims and Contractual Liability Act, pursuant to N.J.S.A. 59:10A–1 and N.J.S.A. 59:10–2, which limit such representation to "an officer, employee or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor." According to the affidavit of Jerry Fischer, dated October 13, 1982, and who, on that date, was Chief of the Claims Service Section of the Division of Law and charged with the responsibility of defending claims brought against State agencies or employees, "the consistent policy of the Attorney General's office has been to decline representation and indemni-

fication to independent motor vehicle agents appointed by the Director of the Division of Motor Vehicles pursuant to N.J.S.A. 39:3–3. During the time I have held my present position, a number of such requests have been received and have been uniformly denied. The position of the Attorney General's office with respect to such individuals is that they are not State employees, but rather independent contractors and under N.J.S.A. 59:1–3 are not included within the definition of 'employee'. I know of my own personal knowledge that this has been the long-standing position of the Attorney General's office, and predated my assumption of supervisory responsibilities for the Claims Service Section." Clearly implied in Fischer's uncontested statement is that the Attorney General's policy of refusing to defend and indemnify motor vehicle agents has been a feature of both Democratic and Republican administrations.

considered the following factors significant:

First, there is no requirement that fee agents actually *work* in their offices. Fee agents may select their employees and then delegate duties to them without DOR approval. Aside from accounting for the tax and license money collected, fee agents operate their offices with autonomy not generally accorded State employees. Fee agents supply, at their own expense, office space and equipment, and pay salaries determined by the agents. Fee agents may, and frequently do engage in other business endeavors. They may locate their fee agent office in commercial facilities. Agents are not paid by the State, but instead are statutorily authorized to charge the public for their services. Fee agents pay self-employment taxes. They are not members of the state retirement system.

*Id.* at 128–129 (footnote omitted). The court concluded that "The control exercised by the state is de minimis when compared to the degree of freedom afforded fee agents over the general operation of their offices", and distinguished the agents from the agents' employees in terms of *Elrod-Branti* protection.

The same characteristics of fee agents considered important by the District Court in *Sweeney* in determining that the agents were not public employees were also listed by the Eighth Circuit in its affirmance. *See* 669 F.2d at 545. Virtually all of these factors are also characteristics of New Jersey motor vehicle agents. To the extent that there are differences, those differences do not create a distinction. Plaintiffs implicitly recognize the *de minimis* nature of any differences by confining their arguments regarding *Sweeney* largely to underlining that that case is not controlling precedent. *Thompson v. Calmar S.S. Corporation*, 331 F.2d 657 (3rd Cir.1964), cert. denied 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964). *See* plaintiffs' brief in opposition at 4. While that proposition is, of course, correct, *Sweeney* remains highly persuasive.[10]

Plaintiffs would have the Court extend *Elrod-Branti* to "insure that a person is not penalized by the government with the loss of his livelihood or substantial part of his livelihood because he happens to have political beliefs differing from those in power." *Id.* Whatever the merits of that principle—and some would question its util-

---

**10.** Many of the factors considered by the *Sweeney* court and imported here are consonant with those that under pinned the Third Circuit's recent decision adopting the hybrid "right to control"/"economic realities" standard for determining who is an employee entitled to protection under the Age Discrimination in Employment Act. *See E.E.O.C. v. Zippo Mfg. Co.,* 713 F.2d 32, 37 (3rd Cir.1983). The "right to control" prong is essentially the common law standard. If the "employer" had the right to determine what work should be done and how it should be done, then the person doing the work was considered an employee. *Id.* at 36. However, in *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947), the Supreme Court decided that the common law test was too narrow for use in deciding employee status for the purposes of important social legislation, such as the Social Security Act, and adopted an "economic realities" test which considered the dependency of the putative employee upon the business to which he renders service. Other factors considered in *Bartels* were the permanency of the relationship, the skill required, the investment in the facilities for work, and the opportunities for

profit or loss. The hybrid approach, first adopted by a number of courts in Title VII cases, holds that "it is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative." *Cobb v. Sun Papers, Inc.,* 673 F.2d 337, 341 (11th Cir.1982), cert. denied 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982). The "economic realities" are examined, but it is the employer's right to control the employee that is considered to be the most important factor. *See Hickey v. Arkla Industries, Inc.,* 699 F.2d 748, 751 (5th Cir.1983); *Spirides v. Reinhardt,* 613 F.2d 826, 831 (D.C.Cir.1979). The hybrid approach has now been extended to ADEA cases. *See Garrett v. Phillips Mills, Inc.,* 721 F.2d 979 (4th Cir.1983); *E.E.O.C. v. Zippo Mfg. Co., supra.* The relatively minimal control exercised by the state over motor vehicle agents and the relative independence from state *executive* agencies in terms of business flowing to the agents, lead to the conclusion that were one to make use of the hybrid standard in determining who is employee and not an independent contractor for *Elrod-Branti* purposes, plaintiffs would be excluded from protection.

ity [11]—I must recognize that the Supreme Court has not given Federal courts license to create new shielded classes by so expansively reading cases in which the high Court has taken care to be precise as to whom it seeks to protect. *See LaFalce v. Houston, supra* at 294–295 (apparent desire of Supreme Court to contain *Elrod-Branti* principle). Accordingly, I hold that plaintiffs were not public employees and, thus, were not entitled to the protection of *Elrod-Branti.* Summary judgment against the individual plaintiffs is, therefore, warranted,[12] and defendants' motion is granted.

11. "Patronage in one form or another has long been a vital force in American politics. Civil service laws, laws ... requiring public contracts to be awarded to the low bidder, laws regulating the financing of political campaigns, and decisions such as *Elrod* and *Branti* have reduced the role of patronage in politics but have not eliminated it entirely. The desirability of reducing it still further raises profound questions of political science that exceed judicial competence to answer ... The consequences might be wholly desirable, or wholly undesirable, or some mixture of the two, but we are reluctant to tamper with political institutions when the competing First Amendment interests are as attenuated as they appear to be here." *LaFalce v. Houston, supra* at 294 (citation omitted). This conclusion applies with equal force in the instant matter.

12. This analysis is dispositive on the merits of the claim of the New Jersey Association of Motor Vehicle Agents and, therefore, renders it unnecessary for the court to consider whether the Association has standing to be an appropriate plaintiff in this lawsuit. It is likewise unnecessary to consider the remaining issues raised by defendants.