796 F.2d 668
 55 USLW 2077, 1 Indiv.Empl.Rts.Cas. 693
 Patricia HORN, Mary Jane Reed, Edward Munley, Marvin
Olinsky, Michael Tango, and the New Jersey Motor Vehicle
Agents Association, Marie Luberto, Raymond E. Littleford,
Joseph Nemyo, John Letz, Florenne D. Sweethood, J. Harold
Webb, Leona B. Clyde, and Ann Laonne, Appellants,
v.
Thomas KEAN, Governor of the State of New Jersey, Irwin
Kimmelman, Attorney General State of New Jersey
and Clifford Snedeker, Director of Motor
Vehicles State of New Jersey.
 No. 84-5729.
 United States Court of Appeals,
Third Circuit.
 Argued June 18, 1985.
Argued In Banc May 5, 1986.
Decided July 16, 1986.
As Amended July 16, 1986.
 
 Dennis O'Leary (Argued), Sussex, N.J., for appellants.
 Andrea M. Silkowitz (Argued), Deputy Atty. Gen. of New Jersey, Newark, N.J., Irwin I. Kimmelman, Atty. Gen. of New Jersey, for appellees; Michael R. Cole, First Asst. Atty. Gen., Trenton, N.J., of counsel.
 Before ALDISERT, Chief Judge, GIBBONS, Circuit Judge, and DIAMOND, District Judge.*
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT, in which
 Judges HUNTER, WEIS, and HIGGINBOTHAM join, and in
 which Judge BECKER joins except for part IV.
 Before ALDISERT, Chief Judge, and SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.
 ALDISERT, Chief Judge.
 
 
 1
 The ultimate question for decision is whether New Jersey motor vehicle agents, chosen for their positions by a Democratic governor through the political patronage process, are insulated by the first amendment from being replaced by the governor's successor, a Republican. The district court held that they did not come within the protection of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), because they were independent contractors and not "public employees," and granted appellees' motion for summary judgment.
 
 
 2
 This appeal requires us to determine whether the motor vehicle agents are employees or contractors and, if contractors, whether this distinction makes a difference under the teachings of Elrod and Branti. We hold that the district court properly determined that the agents are not within the first amendment's protection, Horn v. Kean, 593 F.Supp. 1298 (D.N.J.1984), and affirm its judgment.
 
 I.
 
 3
 The agents brought suit against the Governor, the Attorney General, and the Director of Motor Vehicles of New Jersey alleging that their dismissals as motor vehicle agents were based on political party affiliation and violated the first, fifth, and fourteenth amendments to the United States Constitution.[1] These agents register motor vehicles, issue registration certificates, and license drivers. Unlike most public employees, they are not paid a fixed salary but receive a fee for every vehicle registered and license issued.[2] Appellants, all Democrats, appointed by a Democratic state administration, were relieved of their duties as motor vehicle agents after Thomas Kean, a Republican, began his term as Governor.
 
 
 4
 The record here reveals that New Jersey historically has not required prospective motor vehicle agents, as a condition of their employment, to terminate existing employment relationships or business endeavors. App. at 47. Of the five original named plaintiffs in this action, only one accurately could be classified as working as a motor vehicle agent on a full time basis; the remaining four all worked in other occupations. 593 F.Supp. at 1302. They operate relatively free from state control or supervision and retain complete authority to establish the qualifications for employment in their agencies. They hire, fire, and promote employees in their agencies. App. at 47, 71, 89, 109, 118, 128, 129, 138, 148. Employees of the agents are paid by the agents, not by New Jersey. As employers, the agents make the usual deductions for withholding taxes, Social Security, and Workmen's Compensation.
 
 
 5
 The parties concede that no disputed issues of material fact exist. The court's determination that the agents' status as independent contractors precluded protection under Elrod and Branti is a question of law; our review is therefore plenary. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573-74 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 
 6
 Our analysis tracks two inquiries. First, we must determine whether the district court properly classified appellants as independent contractors. Second, we address the constitutional issue of whether the district court properly limited the Elrod-Branti protection from "patronage dismissals" to public employees, excluding from protection independent contractors.
 
 II.
 
 7
 We are assisted in determining the motor vehicle agents' status under New Jersey law by, coincidentally, an opinion written by Justice Brennan--author of the plurality opinion in Elrod --when he was a judge on the appellate division of the New Jersey Superior Court. In Carluccio v. Ferber, 18 N.J.Super. 473, 87 A.2d 439 (App.Div.1952), a former motor vehicle inspection agent sought reinstatement to his position, arguing that as a veteran the state could not, under the Veterans' Tenure Act, discharge him at will. The New Jersey court, speaking through Judge Brennan, rejected this argument:
 
 
 8
 [A]n agent designated under R.S. 39:3-3, N.J.S.A., is not a person "holding any employment, position or office under the government of this State" and "receiving a salary from such State" within the intendment of the Veterans' Tenure Act.
 
 
 9
 ....
 
 
 10
 ... [T]he agent designated under R.S. 39:3-3, N.J.S.A. may act only "until his authority is revoked" by the Director, and his compensation is based upon registration certificates issued by him and for every license granted by him, and the Director has authority to limit the fee so paid to a maximum. The Legislature obviously intended to, and did, place in the hands of the Director large and unusual determinative powers, including the designation and removal, and the fixing of the number and the compensation of such agents. Plainly the agent is not within the class of persons in public service contemplated by the Legislature to be limited to persons holding "employment, position or office" and "receiving a salary from such state".... The legislative intention was to give the Director full rein to control the tenure of his agents and to appoint and remove at his pleasure.
 
 
 11
 Id. at 476-77, 87 A.2d at 440 (citations omitted). See also In re Fitzgerald, 188 N.J.Super. 476, 482, 457 A.2d 1208, 1211 (App.Div.1983) ("By their nature, motor vehicle agencies are independently run operations managed by independent contractors who are not subject to the benefits and protection of the State's pension and tenure statutes...."). As a federal court we are bound by this formidable state authority, and, accordingly, find no error in the district court's ultimate fact determination that the appellants were independent contractors. We turn now to the merits of the appellants' constitutional argument.
 
 III.
 
 12
 For the purpose of this decision and by reason of the doctrine of stare decisis that requires inferior courts to follow decisions of a superior court, we are required to respect and adhere to the precise decisions in Elrod and Branti. We do this unqualifiedly. We wish to emphasize that our decision should rise or fall on an interpretation of the Constitution, not as a referendum on whether political scientist reformers were absolutely correct in demanding elimination of patronage and installing virtually universal civil service in its stead. Suffice it to say, there is much room for debate. For every horror story in, to use the pejorative, the "spoils system"--a litany that need not be repeated now--a civil service misadventure probably can be cited. But insofar as the Constitution is concerned, these matters are irrelevant.
 
 IV.
 
 13
 The analysis of the constitutional issue begins with the first amendment's mandate that "Congress shall make no law ... abridging the freedom of speech, or of the press...." Decades of Supreme Court case law make it clear that the free speech mandate is no longer limited to statutes enacted by Congress; it "is made obligatory on the States by the Fourteenth" amendment. Jacobellis v. Ohio, 378 U.S. 184, 195, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 101 (1964) (Black, J., concurring). The reasons for its incorporation into the fourteenth amendment are somewhat shrouded, and do not surface readily in Supreme Court opinions; perhaps a reasoned elaboration has never been set forth. For example, Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), often cited as the seminal case incorporating the free speech clause, substituted assumption for reason, and a conclusion for a point of beginning: "For present purposes we may and do assume that freedom of speech and of the press--which are protected by the First Amendment from abridgment by Congress--are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." 268 U.S. at 666, 45 S.Ct. at 629. Notwithstanding the scanty, if not evanescent, explanation, we do recognize and reiterate that such incorporation has taken place,[3] and enthusiastically agree that "this freedom is an inestimable privilege in a free government...." Id. at 667, 45 S.Ct. at 630.
 
 
 14
 Moreover, the Supreme Court instructs that for the first amendment to be implemented, some form of state action must exist.
 
 
 15
 It matters not that the [state] law has been applied in a civil action and that it is common law only, though supplemented by statute.... The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. See Ex parte Virginia, 100 U.S. 339, 346-47, 25 L.Ed. 676; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855.
 
 
 16
 New York Times Co. v. Sullivan, 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964).
 
 
 17
 Several reasons prompt our emphasis on these considerations at this time. First, there must be state action to trigger the prohibitions of the first amendment. New York Times v. Sullivan, 376 U.S. at 265, 84 S.Ct. at 718. Second, its application to the states is bottomed on rights and liberties protected by the due process clause of the fourteenth amendment. Gitlow v. New York, 268 U.S. at 666, 45 S.Ct. at 629. Third, the expansion of the naked, seemingly unambiguous text of "Congress shall make no law ..." to the present full dress of first amendment applications has not been an incremental development, as is customary in the common law tradition, by judicial tribunals that the Constitution's Article III describes as "inferior courts." Rather, the development has been decreed on the highest level, by the Supreme Court itself, in quantum leaps, in cases such as Gitlow v. New York, New York Times v. Sullivan, and Elrod v. Burns. This consideration is central to our analysis of the first amendment issue presented here. It is critical because the pretentious first amendment limitation on the centuries' old practice of political patronage in a democratic society[4] has been considered only in two Supreme Court cases since the first amendment's adoption in 1791.[5] If for no other reason, this circumstance signals that district courts and courts of appeals should be extremely chary in expanding the precise holdings of the Supreme Court in an extremely volatile area of historically established and traditionally accepted characteristics of government, be it on a municipal, county, state, or federal level.[6]
 
 V.
 
 18
 In Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a sharply divided Supreme Court[7] held that a nonpolicymaking, nonconfidential government employee cannot be discharged or threatened with discharge upon the sole ground of political beliefs. Id. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). The plurality opinion by Justice Brennan announcing the judgment of the Court was joined by two other justices. Justice Brennan acknowledged the historically pervasive practice of political patronage and explicitly limited the opinion's focus: "Although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons." Id. at 353, 96 S.Ct. at 2679. The concurring opinion reinforced Elrod 's narrow focus: "This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations." Id. at 374, 96 S.Ct. at 2690 (Stewart, J., concurring). In Branti v. Finkel, the Court reaffirmed the unconstitutionality of patronage dismissals of public employees, but re-emphasized the straitened holdings of both Elrod and Branti:
 
 
 19
 [In Elrod,] Mr. Justice Brennan noted that many other practices are included within the definition of a patronage system, including placing supporters in government jobs not made available by political discharges, granting supporters lucrative government contracts, and giving favored wards improved public services. In that case, as in this, however, the only practice at issue was the dismissal of public employees for partisan reasons.
 
 
 20
 Branti, 445 U.S. at 513 n. 7, 100 S.Ct. at 1292 n. 7 (citation omitted).
 
 
 21
 We are convinced that both Justice Brennan in Elrod and the Court, speaking through Justice Stevens in Branti, understood that the term "public employee" denoted a discrete class of workers with certain common characteristics. We believe that it is beyond doubt that the teachings of these cases did not encompass all individuals who perform compensated work for a governmental entity. The Court has restricted the effects of its revolutionary holdings in Elrod and Branti to dismissals of "public employees for partisan reasons." We perceive neither authority nor inkling in these decisions to extend first amendment protection beyond stated circumscriptions. Lacking specific authorization and admonished that the Court specifically has excluded "government contracts" from the reach of the constitutional prohibition, we conclude that Elrod and Branti do not compel us to extend the protection of the first amendment to the contractors who serve as New Jersey motor vehicle agents.
 
 VI.
 
 22
 Our inquiry, however, does not end here. We move to a simple, but essential, premise: the first amendment does not prohibit all forms of conduct based on political partisanship. Justice Powell underscored this proposition's validity by noting: "[No] incumbent [may] contend seriously that the voters' decision not to re-elect him [in state-sponsored elections] because of his political views is an impermissible infringement upon his right of free speech or affiliation." Branti, 445 U.S. at 533, 100 S.Ct. at 1302 (Powell, J., dissenting). And, of course, even in the area of public employment, the Branti Court acknowledged that "Elrod recognize[d] that party affiliation may be an acceptable requirement for some types of government employment." Branti, 445 U.S. at 517, 100 S.Ct. at 1294.
 
 
 23
 From this major premise we move to the thesis that although the respective interests identified to be weighed by the Court in Elrod and Branti are similar to interests implicated when patronage practices affect independent contractors, the actual balance struck produces a different result. The Elrod plurality succinctly observed: "Preservation of the democratic process is certainly an interest protection of which may in some instances justify limitations on First Amendment freedoms." Elrod, 427 U.S. at 368, 96 S.Ct. at 2687 (citing Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947)). Clearly, partisan politics lies at the very core of our democratic process, and just as clear is the notion that permitting those who hold public office to employ independent contractors based on political party affiliation provides an effective method to implement the administration's program. "Policy implementation is just as important as policymaking." Loughney v. Hickey, 635 F.2d 1063, 1066 (3d Cir.1980) (Aldisert, J., concurring).
 
 
 24
 Although the politically-based interests sought to be advanced by patronage practices are similar whether public employees or contractors are involved, the countervailing first amendment interests differ. This distinction is important because the central concern of the Court in Elrod and Branti --that public employees are coerced by patronage practices to adopt or disassociate themselves from a particular political belief--has diminished importance where the recipient is not a state employee but one who contracts with the state.
 
 
 25
 A decision from the Seventh Circuit forcefully emphasizes this difference. In LaFalce v. Houston, 712 F.2d 292 (7th Cir.1983), cert. denied, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984),[8] the court focused on how the first amendment interests of public employees and independent contractors differ. The court emphasized this distinction to support its holding that the first amendment did not prohibit a city from awarding a public contract based on political criteria:
 
 
 26
 If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent and the state does not have laws requiring the award of the contract to the low bidder (or the laws are not enforced), it is not the end of the world for him; there are other government entities to bid to, and private ones as well. It is not like losing your job. Of course, the contrast can be overstated; unless the government worker who loses his job cannot find another job anywhere, the loss will not be a total catastrophe. Nevertheless, many government workers could not find employment at the same wage in the private sector; and the prospect that a protracted period of search following discharge might well result in a substantially less well paid job would cause many government workers to flinch from taking political stands adverse to their superiors. An independent contractor would tend we imagine to feel a somewhat lesser sense of dependency.
 
 Id. at 294 (emphasis supplied).[9]
 
 27
 The record here supports precisely the motor vehicle agents' diminished dependency on the state to which the LaFalce court made reference. Like the LaFalce court, we are reluctant "to tamper with political institutions when the competing First Amendment interests are as attenuated as they appear to be here." Id.
 
 VII.
 
 28
 We are aware that the Supreme Court in Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), expressly rejected, for purposes of fifth amendment analysis, "[any] difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor." Id. at 83, 94 S.Ct. at 325. We are persuaded that Lefkowitz does not control the outcome here. Unlike the fifth amendment issue addressed in Lefkowitz, this case requires balancing the important interests served by the first amendment. It requires balancing patronage practices against the first amendment right of freedom of speech and association. The Lefkowitz Court applied well settled fifth amendment doctrine. But ours is a different task here. We must analyze the first amendment rights asserted by appellants in light of the highly circumscribed holdings of Elrod and Branti. We note that the Supreme Court itself, speaking through Justice Stevens in Branti, seven years after the decision in Lefkowitz, sowed the seeds of the employee/contractor dichotomy in first amendment challenges to patronage practices. The Court noted that "many ... practices are included within the definition of a patronage system, including ... granting supporters lucrative government contracts.... In [ Elrod ], as in this [case], however, the only practice at issue was the dismissal of public employees for partisan reasons." Branti, 445 U.S. at 513 n. 17, 100 S.Ct. at 1292 n. 17 (citation omitted).
 
 
 29
 We also find persuasive the reasons advanced by the Eighth Circuit in Fox & Co. v. Schoemehl, 671 F.2d 303 (8th Cir.1982), for distinguishing Lefkowitz from cases involving first amendment challenges to patronage practices. The Fox court accepted the employee/contractor dichotomy in holding that various auditors under contract with a city enjoyed no first amendment rights under Elrod and Branti. The court expressly rejected the contractors' argument that Lefkowitz commanded a different result:
 
 
 30
 We decline to extend Lefkowitz's fifth amendment protection of contractors to the present first amendment case. We note that the Supreme Court limited its rulings in Elrod v. Burns ... and Branti v. Finkel ... to public employees. It is not for this court to expand upon that ruling.
 
 
 31
 We note further that Chief Justice Burger and Justices Stewart, Powell and Rehnquist joined Justice White in the Lefkowitz case holding that a state could not compel testimony in violation of the fifth amendment. Chief Justice Burger and Justices Powell and Rehnquist dissented in Elrod, arguing that the governmental interest in a patronage system outweighed a public employee's first amendment rights. Elrod v. Burns, supra, 427 U.S. at 387, 96 S.Ct. at 2696.... In Branti, Justices Stewart, Powell and Rehnquist dissented, again arguing that the government had a significant interest in the patronage system. It is therefore apparent that a different analysis may apply in weighing governmental interests against first amendment rights, as in cases such as this, and against fifth amendment rights as were at issue in Lefkowitz.
 
 
 32
 Id. at 305 n. 3 (citations omitted).
 
 VIII.
 
 33
 In deciding this case, we draw upon the cumulative experience of other federal judges who have confronted this issue. Every federal judge, district or circuit, who has been faced with the public employee/contractor dichotomy has agreed with Judge Barry, the district judge in this case. We find persuasive support for affirming Judge Barry not only in LaFalce, but also from two decisions of the Eighth Circuit. In Sweeney v. Bond, 669 F.2d 542 (8th Cir.), cert. denied sub nom. Schenberg v. Bond, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982), the court addressed the precise question we now decide, rejecting a first amendment challenge by state motor vehicle agents who had been dismissed for politically partisan reasons. The court stated an unwillingness "to extend the patronage decisions to cases which do not involve public employees." Id. at 545. See also Fox & Co. v. Schoemehl, 671 F.2d 303 (8th Cir.1982) (accounting firm hired to audit books of school board was independent contractor and therefore could be denied auditing contract because of its political affiliation). The cumulative experience of the federal trial and appellate judges who have considered this question in the above three cases uniformly supports the decision we reach today.[10]
 
 
 34
 To recapitulate, we embrace the proposition that application of the first amendment has never been considered as absolute dogma that runs roughshod over other fundamental values. We recognize that in adding the formidable gloss to the naked constitutional text of "Congress shall make no law ...", the courts often have applied a balancing approach. Having weighed interests implicated here, we are persuaded first, that the independent contractors in this case differ in significant respects from public employees and, second, that the distinctions lead to different first amendment treatment of the two classifications. As the force of a first amendment assault on state patronage practices moves from public employment into the outer spheres of political life, we are extremely hesitant to realign radically, in the name of the Constitution, a political constellation that has been with us since the Republic was formed. We wholeheartedly agree with the court in LaFalce: "Some day the Supreme Court may extend the principle of its public-employee cases to contractors. But there are enough differences in the strength of the competing interests in the two classes of cases to persuade us not to attempt to do so." 712 F.2d at 295.
 
 IX.
 
 35
 We emphasize that our decision rests, as did the decisions in LaFalce, Sweeney, and Fox, on a first amendment analysis only. No other constitutional issue was raised in the district court or before us, and apparently no other issue was raised in those cases. In LaFalce, Judge Posner clearly framed the issue to be decided: "We are asked to hold that the First Amendment, as applied to the states through the due process clause of the Fourteenth Amendment, forbids a city to use political criteria in awarding public contracts." 712 F.2d at 293. Likewise, in Sweeney, Judge Ross posed the issue as whether the plaintiffs could be discharged "because of their political affiliation and in violation of the first amendment." 669 F.2d at 544. Moreover, in rejecting an attempt to apply Elrod-Branti to city auditors determined to be independent contractors, speaking again through Judge Ross, the court in Fox made it clear "that a different analysis may apply in weighing governmental interests against first amendment rights, in cases such as this, and against fifth amendment rights" in other cases. 671 F.2d at 305 n. 3.
 
 X.
 
 36
 This too must be said. The courts are faced daily with the conundrum: "The law must be stable, yet it cannot stand still." This is especially true in constitutional law because the Constitution's text is a moral statement designed to fluctuate with the upward mobility of community values. Nonetheless, the courts must understand that a line exists between permissible first amendment applications and an undue rupture of accepted principles of community and historical American values, and the legal disciplines that have developed through the centuries. Courts should heed the admonition of Justice Holmes: "[I]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it...." Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922).
 
 
 37
 Toeing this line is even more sensitive in first amendment cases, where precepts that actually govern are entirely judge-made, lavishly superimposed on a text that prohibited only acts of Congress that restrained speech.[11] We are reminded of what Justice Rehnquist has written in another context--that the Court is "less willing to extrapolate an already extended line when, although the general nature of the principle sought to be applied is clear, its precise limits and their ramifications become less so." Scott v. Illinois, 440 U.S. 367, 372, 99 S.Ct. 1158, 1161, 59 L.Ed.2d 383 (1979). This is especially important when under the guise of the free speech clause the judiciary would intrude itself into such traditional practices as contract awards by the government's executive, be it on a federal, state, or local level. Whether couched in terms of absolutism, or ad hoc balancing, or definitional balancing, first amendment law, distilled to its essence, is a judicial formulation of what constitutes the appropriate public policy, or in Cardozo's phrase, "the good of the collective body,"[12] always recognizing that because of judicial process limitations, the courts define social policies of maxiumum output from limited inputs. As early as 1888, Holmes observed:
 
 
 38
 The very considerations which judges most rarely mention and always with an apology are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient to the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy in the last analysis.
 
 
 39
 O.W. Holmes, The Common Law 31-32 (1888). But an otherwise little known British judge produced the aphorism that public policy "is a very unruly horse and once you get astride it you never know where it will carry you." Richardson v. Mellish, 2 Bing. 229, 252 (1824) (Burrough, J.). We do not know where Elrod and Branti will carry us, but we do know that once a genie escapes from the bottle he is not easily cabined. We believe that it is a danger for courts, other than the Supreme Court, to expand this particular rule.XI.
 
 
 40
 For the above reasons, we believe that if and when the mold of Elrod-Branti is to be broken, and its holding applied to new fact situations, the extension should be at the order of the Supreme Court and not the lesser courts in the judicial hierarchy. Accordingly, we will affirm the judgment of the district court.
 
 
 41
 SEITZ, Circuit Judge, concurring.
 
 
 42
 While I join in the essential points made and the result reached in Chief Judge Aldisert's opinion, I write merely to note that I do not find it necessary to speak to some of the elaboration contained therein, e.g., the implicit criticism of the incorporation doctrine.
 
 
 43
 ADAMS, Circuit Judge, concurring.
 
 
 44
 In Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court ruled that a public employer may not discharge nonconfidential, nonpolicymaking employees solely on the basis of their political affiliation, even if that affiliation was the basis on which those employees gained their positions originally. These decisions represented a judicial foray into a realm of official decisionmaking that had traditionally been left to the political branches of government.
 
 
 45
 The judicial branch has an obligation to respect political choices, and, unless impelled by a constitutional provision, it need not respond to every harm alleged to have been caused by such choices. While the Supreme Court in Elrod and Branti felt constrained by the First Amendment to strike down certain patronage decisions, on both occasions it carefully limited its holdings to apply only to the dismissal of public employees. Because the Court was so circumspect, and because any wider application would intrude even further on political decisions, we must be cautious not to expand unduly the rights recognized in Elrod and Branti. In my view, the present case does not present an appropriate occasion for such expansion, at least by this Court.
 
 
 46
 The dismissed motor vehicle agents have lost a valuable source of public funds, but, unlike the terminated employees in the Supreme Court's cases, they have not all been deprived of their sole source of income. See LaFalce v. Houston, 712 F.2d 292, 294 (7th Cir.1983), cert. denied, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984). A denial of one opportunity for compensation is not comparable to the disruption and hardship caused by an individual's loss of his only job. See Wygant v. Jackson Board of Education, --- U.S. ----, 106 S.Ct. 1842, 1851, 90 L.Ed.2d 260 (1986) (opinion of Powell, J.). Accordingly, the balance that produced the categorical rule in Elrod and Branti favoring public employees is not present in the specific factual context before us.
 
 
 47
 In this controversial area, raising delicate questions of separation of powers, I decline the opportunity to extend the rulings of the Supreme Court beyond their expressly limited scope. Of course, that Court may, if it so determines, declare that it did intend broader application of the seemingly narrow rule announced in Elrod and Branti. Where the Supreme Court has announced a constitutional rule that is immune from legislative amendment, any broadening of that rule, which necessarily would have a similar effect, ordinarily should be left to it.
 
 
 48
 Thus, while I do not subscribe to much of the reasoning expressed by the majority, I concur in the result it reaches today.
 
 
 49
 GARTH, Circuit Judge, concurring, with whom A. LEON HIGGINBOTHAM, Jr., Circuit Judge, joins:
 
 
 50
 I do not share the views expressed in the majority opinion which are critical of the holdings and analysis of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In my opinion, these cases represent neither a grave threat to the democratic political process nor a sharp break with constitutional tradition. Moreover, I do not share the largely benign view of political patronage implicit in the majority opinion. Indeed, I did not share those views when they were expressed in Judge Aldisert's concurring opinion in Loughney v. Hickey, 635 F.2d 1063, 1065 (3d Cir.1980), a case in which I joined the per curiam opinion of the court. To the extent that today's judgment in the case sub judice is based on the analysis which gave rise to the Loughney concurrence, I therefore respectfully decline to join in the majority opinion.
 
 
 51
 Nevertheless, I agree that on the facts and the record of this case, no First Amendment considerations bar the replacement of motor vehicle agents of Democratic persuasion with motor vehicle agents aligned with the Republican Party. I agree with Judge Aldisert, writing for the majority, that if the Elrod-Branti doctrine is to be substantially expanded so as to apply to the facts of this case, that task properly falls to the Supreme Court.
 
 
 52
 As the majority opinion properly notes, see at 675 n. 8, we must decide only the case that is actually before us. I therefore do not express a view on whether the present Elrod-Branti analysis might provide protection for an independent contractor so economically dependent on government business as to be indistinguishable in any principled way from a government employee.
 
 
 53
 Because I agree with the majority's disposition on the facts and record of this case, I join in the judgment of the court.
 
 
 54
 GIBBONS, Circuit Judge, dissenting, with whom Judges SLOVITER, MANSMANN, and STAPLETON join:
 
 
 55
 In the opinion announcing the judgment of the court Judge Aldisert holds that New Jersey Motor Vehicle Agents are independent contractors. I agree with that conclusion. It is undisputed that these agents, although they perform the purely clerical functions of issuing, for a fee, motor vehicle registration certificates and drivers licenses, are not paid a fixed salary. In addition it is also undisputed that these agents hire and fire their subordinate clerks and are free to engage in other activities. Moreover, their independent-contractor status is essentially an at-will contract. Thus this appeal presents the question whether states, by contracting out functions that would normally be performed by state servants, may free themselves from the strictures of the first amendment. A majority of the court concludes that states may do so. I dissent.
 
 
 56
 One matter dealt with in the opinion announcing the judgment of the court need not long detain us; the discussion of the state action requirement. At 671-672. There is no doubt that the terminations of at-will contractual relationships of which the plaintiffs complain involve state action. It is undisputed that the terminations were accomplished by the Governor and the Director of Motor Vehicles, both acting under color of their respective offices. Thus, while the purpose of the extended state action discussion in the opinion announcing the judgment eludes me, I will proceed on the assumption, apparently shared by a substantial majority if not the entire court, that the action complained of is for first amendment purposes governmental action.
 
 
 57
 The district court, relying principally on LaFalce v. Houston, 712 F.2d 292 (7th Cir.1983), cert. denied, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), concluded that the motor vehicle agents' status as independent contractors for, rather than servants of, the state, required the dismissal of their first amendment claims. In LaFalce the Court of Appeals for the Seventh Circuit adopted the same distinction made by the Court of Appeals for the Eighth Circuit. See Fox & Co. v. Schoemehl, 671 F.2d 303, 304 (8th Cir.1982) (patronage dismissal by City of St. Louis of independent auditors held to be constitutional); Sweeney v. Bond, 669 F.2d 542, 545 (8th Cir.) (patronage dismissal by Missouri of independent-contractor motor vehicle agents held to be constitutional), cert. denied, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982). The judges in the majority here also adopt that servant/independent-contractor distinction. That distinction is entirely irrelevant to the animating purposes of the first amendment. Moreover, its adoption has the potential for eroding the first amendment's protection of millions of Americans whose livelihood depends upon the expenditure of funds raised by federal, state, and local governmental entities.
 
 
 58
 If Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion), were a procedural due process case aimed at the protection of an expectation in continued employment found in state law, the distinction adopted by the majority between servants and independent contractors arguably would be relevant. In such a hypothetical case, the degree of due process protection might well depend on the degree of economic dependence of the plaintiff on the contract or property right being terminated.[1] See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In Elrod, however, there was no state-law expectation in the continuance of an at-will employment relationship. Both Justice Brennan's plurality opinion and Justice Stewart's concurring opinion rest squarely upon the government's interference with a federally protected substantive liberty interest--freedom from government attempts to control beliefs and associations. When the Supreme Court in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), reaffirmed the Elrod rule, it dealt, again, with a case in which there was no state law property interest, and rested its holding upon the existence of a federally protected substantive liberty interest. The Supreme Court has never suggested that the availability of the substantive protection of the first amendment depends upon the economic status of the party claiming that protection.[2]
 
 
 59
 The first amendment protects all persons in the United States.[3] Concededly its prohibitions are not absolute. However, when the Elrod Court faced the question whether the government could fire employees for purely political reasons, it was not writing on a clean slate. Rather, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, ha[d] been uniformly rejected." Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 684-85, 17 L.Ed.2d 629 (1967). For example in Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court had invalidated a requirement that state employees deny past or present association with Communists. Id. at 191-92, 73 S.Ct. at 218-19. In Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), the Court held that teachers employed on a year-to-year basis could not constitutionally be required to disclose to the government the organizations to which they belonged or regularly contributed. Id. at 490, 81 S.Ct. at 253. In Keyishian the Court invalidated a New York statute barring state employment on the basis of membership in "subversive" organizations. 385 U.S. at 606, 87 S.Ct. at 685. In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court rejected the contention that public school teachers could be terminated for public statements on matters of public interest. Id. a 574-75, 88 S.Ct. 1737-38. And in Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), the Court expressly rejected, for purposes of the privilege against self-incrimination, any distinction between the status of an at-will servant and an at-will independent contractor. Id. at 78, 94 S.Ct. at 322.
 
 
 60
 Given this unbroken line of authorities it was hardly surprising that a majority of the Court in Elrod rejected the contention that state servants occupying nonpolicymaking positions surrendered their first amendment rights upon accepting state employment. The opinion announcing the judgment of this court hyperbolically describes Elrod and Branti as "revolutionary holdings." They are hardly revolutionary in light of the unbroken line of authorities from 1952 through 1973. Indeed, neither the judges in the majority nor the judges writing for the Seventh and Eighth Circuits point to any Supreme Court majority opinion that ever suggested that government benefits could be distributed upon the basis of political beliefs or affiliations. Indeed, the Supreme Court has adopted the opposite view stating that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (footnote omitted).
 
 
 61
 The only state interest recognized in Elrod as sufficient to justify a limitation on first amendment rights was the state's interest in having policymaking positions occupied by persons deemed sympathetic to the policies espoused by elected public officials. 427 U.S. at 366, 372-73, 96 S.Ct. at 2686, 2689. In Branti the Court held that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1294. Applying that standard, the Court disapproved of the discharge of nine assistant public defenders.
 
 
 62
 Thus Elrod and Branti did not announce any "revolutionary" first amendment right applicable only to servants of the government. Rather they rejected the contention that public employees have lesser first amendment rights than are enjoyed by other members of society. This interpretation of the Elrod and Branti holdings is consistent with the Court's treatment of public-employee, first-amendment claims both prior to and since 1980. For example, in Pickering the Court, after first rejecting the contention that public employees "may be constitutionally compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest," went on to consider whether a compelling state interest of the state as an employer could overcome the employees' federal substantive liberty interest. 391 U.S. at 568, 88 S.Ct. at 1734. Justice Marshall noted that "[i]t is ... perfectly clear that, were appellant a member of the general public, the State's power to afford the appellee Board of Education or its members any legal right to sue him for writing the letter at issue here would be limited by the requirement that the letter be judged by the standard laid down in New York Times [v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ]". Pickering, 391 U.S. at 573, 88 S.Ct. at 1737. The Court then held unanimously that the public employee enjoyed the same first-amendment right to free expression as did the general public. Id. at 574, 88 S.Ct. at 1737. More recently in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court held that the first-amendment rights of public employees were the same as, not greater than, those of the general public. Id. at 147, 103 S.Ct. at 1690. "Our responsibility," wrote Justice White, "is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State." Id.
 
 
 63
 The judges in the majority stand the Supreme Court's reasoning on its head. They treat the status of servant of the government as if, in Elrod and Branti, the Court had anointed the holders of such status with first-amendment rights not conferred upon others. The recognition of a limited exception to the general protection afforded by the first amendment is thus converted into a limitation upon the first-amendment rights of citizens. The fallacy of such reasoning is patent. By treating the Elrod/Branti rule as a "revolutionary" rule applicable only to servants of government, the judges in the majority manage to avoid the balancing of interests required by the Constitution. The critical question is whether the state's interests in firing independent contractors because of their political associations are sufficiently compelling to overcome the contractors' first amendment interests.
 
 
 64
 Instead of focusing on a state interest that is entitled to greater consideration when weighed against independent contractor's first-amendment rights, the judges in the majority, as well as the authors of the circuit court opinions on which they rely, focus on the supposed economic differences between state servants and state independent contractors. As noted above, this argument is at best relevant only to due process protection of property interests. It has never been suggested that the substantive liberty interests enshrined in the first amendment vary with the economic status of the party exercising them. Even if courts were to treat the degree of economic impact as a fair measure of the degree of first-amendment infringement, however, they would still be obliged to identify a government interest that is compelling and to determine whether the means chosen were the least restrictive available. See Elrod, 427 U.S. at 362-63, 96 S.Ct. at 2684. No such analysis has been attempted. The only state interest that is even mentioned is the interest in political patronage, an interest found wanting in Elrod, see 427 U.S. at 364-69, 96 S.Ct. at 2685-87, and an interest that has never been recognized in a first amendment context by a majority of the Supreme Court. Even in identifying this interest, however, the majority does not engage in the necessary comparison of the state's interests in partronage to the independent contractors' interests in freedom of belief and association. The majority simply assumes, without analysis, that independent contractors lack any substantive liberty interests that need to be accommodated to the patronage interest of incumbent officials.
 
 
 65
 It is not self-evident that the state's interest in patronage takes on greater weight in the independent-contractor context. Indeed just the opposite seems apparent. The sole reason articulated by the majority for distinguishing independent contractors from public employees, in the context of patronage discharges, is the lesser economic impact on the independent contractor. See at 674. Restated, the rationale is that employees who are fired lose their entire income while independent contractors lose only one source of income. Aside from the fact that this is not always the case, this reasoning relies on a difference without constitutional significance. The constitutional wrong condemned in Elrod and Branti was the state's attempt to control the beliefs and associations of its citizens. See Branti, 445 U.S. at 515-17, 100 S.Ct. at 1293-94; Elrod, 427 U.S. at 372, 96 S.Ct. at 2689. That control can be just as effective and offensive when the state reduces a citizen's income by twenty percent as when the state reduces the citizen's income by one hundred percent. The constitutionally significant point is not the quantum of impact, but rather it is the impact itself. While independent contractors may not lose all their income if a state contract is withdrawn, the knowledge that their income would drop by ten percent may be sufficient to induce the contractors to conform their political views to those of the reigning power. It was this chilling effect on citizens' first-amendment rights that produced the holding in Elrod and Branti, see Branti, 445 U.S. at 516-17, 100 S.Ct. at 1293-94; Elrod, 427 U.S. at 359, 96 S.Ct. at 2682, and because the same chilling effect inhibits independent contractors who lose their contracts because of their political views, the rule of Elrod and Branti is equally applicable to this case.
 
 
 66
 The likely consequences of the majority's misstatement of the Elrod/Branti rule are predictable. By treating the cases as "revolutionary" holdings that afforded servants of the state greater first amendment rights than members of the public, the majority's holding will encourage the contracting out of governmental functions. Public employees no longer needed because their work has been contracted out can then be freely discharged as surplus, while the officials in government will remain free to pressure contractors and their employees to support incumbent politicians. The employees of such contractors, forced against their will to contribute time, money, and loyalty to a party not of their choice, will be remediless when faced with the state-law, at-will employment doctrines. See, e.g., State ex rel. Sigall v. Aetna Cleaning Contractors, Inc., 47 Ohio App.2d 247, 248, 353 N.E.2d 913, 916-17 (Ct.App.1974) (state decision to contract out services previously performed by civil service employees approved), aff'd, 45 Ohio St.2d 308, 345 N.E.2d 61 (1976) (per curiam).
 
 
 67
 The opinion announcing the judgment of the court has the virtue of candor with respect to the problem addressed in the preceding paragraph. Judge Aldisert and those who join in his opinion make no effort to conceal their ardent desire that the first-amendment protections for public employees recognized in the line of cases extending from Updegraff in 1952 through Branti in 1980 should be overruled in the interest of "the centuries' old practice of political patronage." At 672, 675-76. However, as members of an intermediate court in a hierarchical structure, we are not at liberty to resort to meaningless factual distinctions in order to avoid clearly controlling Supreme Court precedent with which we disagree. A reference to Justice Powell's attempted historical justification for patronage dismissals in his dissenting opinion in Elrod is no excuse for disregarding the majority holding.
 
 
 68
 More fundamentally, the majority's sentimental attachment to the supposed virtues of the patronage system has led it to announce bad constitutional law. The majority's rule is that the desire to enhance political party strength by using the economic power of the state in the interest of a political party is an interest so weighty that it overcomes the free association and free expression rights of those who seek to benefit from that economic power. The association and expression rights recognized in the cases from Updegraff through Branti are individual rights guaranteed to individuals by the first amendment. Those individuals who have gained access to the levers of power in the state also have individual rights, among them the individual right to belong to political parties. The artificial entity, the state, in its collective sense has an interest in efficiency with respect to the discharge of the functions entrusted to it by the individuals who select its managers. The state itself, however, has no right, in the first amendment or elsewhere, to advance the interests of a political party. Cf. Davis v. Bandemer, --- U.S. ----, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (a case involving claims of political gerrymandering in which the Court recognized that a controlling political party cannot constitutionally use its governmental authority to undercut the position of a noncontrolling political party). It seems to me a strange distortion of democratic political theory to hold that those individuals who have achieved control over the levers of power of the state can assert a state interest, compelling or otherwise, to use the economic power of the state for the purpose of preventing other members of the political collective from competing effectively to replace them.
 
 
 69
 Freedom of association for political purposes is perhaps the most significant individual right Americans enjoy. Utilizing state revenues for the purpose of enhancing the position of the reigning political powers to the disadvantage of all others flies in the face of our constitutional system. Despite paeans to the glories of the Jacksonian spoils system by Justice Powell and Judge Aldisert, I will never be convinced that the Founding Fathers, who so carefully devised checks and balances for the resolution of tensions among competing interest groups, intended to allow one interest group to use state economic power as a weapon in its competition with other interest groups. Judge Aldisert is plainly right that "permitting those who hold public office to employ independent contractors based on political party affiliation provides an effective method to implement the administrators' program." At 674. Aligning the state's economic might with one political group is certainly an effective form of coercion.
 
 
 70
 The state, however, is not the fief of the controlling political party. Our constitutional system recognizes and protects the rights of individuals who belong to opposing parties. Thus, when a newly elected Republican administration discharges motor vehicle agents for the sole reason that they are Democrats, the state has violated the first-amendment rights of the agents, whether or not the agents are considered independent contractors or employees.[4] Consequently, the district court erred in granting summary judgment in favor of the defendants in this section 1983 action, and I would reverse.
 
 
 
 *
 Honorable Gustave Diamond, of the United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The agents apparently abandoned before the district court any claim based on the fifth amendment. Before this court, the agents clearly identify the only question for decision: "The sole issue presented for review is whether or not a New Jersey Motor Vehicle Agent is entitled to the protections afforded by the United States Supreme Court in the cases of Elrod vs. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti vs. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980)." Brief for appellants at 4
 
 
 [2]
 The position of motor vehicle agent is established by statute. N.J.Stat.Ann. Sec. 39:3-3 provides that the Director of Motor Vehicles
 shall designate at least 1 person in each county for each 300,000 inhabitants or fraction thereof to be his agent for the registering of motor vehicles, issuing registration certificates and licensing of drivers, subject to the requirements of this subtitle and to any rules and regulations the director imposes. The agent shall so act until his authority is revoked by the director. All moneys received by such agents for registrations and licenses granted under the provisions of this chapter shall forthwith be deposited as received with the State Treasurer. The fee allowed the agent for registration certificates issued by him and for every license granted by him shall be fixed by the director on the basis of the registration or license fees collected by the agent. The director may limit the fee so paid to a maximum. Such fee shall be paid to the agent by the State Treasurer upon the voucher of the director in the same manner as other State expenses are paid.
 
 
 [3]
 One of our greatest living scholars, Dean Erwin Griswold, has commented, "I shall never understand how the First Amendment 'is made obligatory in the States by the Fourteenth.' I have the feeling that this will go down as one of the greatest ipse dixits in Supreme Court history." Griswold, The Judicial Process, 31 Fed.Bar J. 309, 315 (1972)
 
 
 [4]
 Justice Powell has summarized this history:
 Partisan politics, as we now know them, did not assume a prominent role in national politics immediately after the adoption of the Constitution. Nonetheless, Washington tended to confine appointments even of customs officials and postmasters to Federalists, as opposed to anti-Federalists. As the role of parties expanded, partisan considerations quickly influenced employment decisions. John Adams removed some Republicans from minor posts, and Jefferson, the first President to succeed a President of an opposing party, made significant patronage use of the appointment and removal powers. The administrations of Madison, Monroe, and John Quincy Adams provided no occasion for conspicuous patronage practice in employment, as each succeeded a copartisan. Jackson, of course, used patronage extensively when he became the first President since Jefferson to succeed an antagonistic administration.
 It thus appears that patronage employment practices emerged on the national level at an early date, and that they were conspicuous during Jackson's Presidency largely because of their necessary dormancy during the long succession of Republican Presidents. During that period, however, patronage in hiring was practiced widely in the States, especially in New York and Pennsylvania. This afforded a theoretical and popular legitimacy to patronage, helping to lay the groundwork for acceptances of Jackson's actions on the national level.
 It is recognized that patronage in employment played a significant role in democratizing American politics. See, e.g., C. Fish, The Civil Service and the Patronage 156-157 (1905); Sorauf, Patronage and Party, 3 Midwest J.Pol.Sci. 115-116 (1959). Before patronage practices developed fully, an "aristocratic" class dominated political affairs, a tendency that persisted in areas where patronage did not become prevalent. C. Fish, supra, at 157. Patronage practices broadened the base of political participation by providing incentives to take part in the process, thereby increasing the volume of political discourse in society. Patronage also strengthened parties, and hence encouraged the development of institutional responsibility to the electorate on a permanent basis. Parties became "instrument[s] through which discipline and responsibility may be achieved within the Leviathan." Sorauf, supra at 115.
 Elrod v. Burns, 427 U.S. at 378-79, 96 S.Ct. at 2691-92 (Powell, J., dissenting). See also D. Rosenbloom, Federal Service and the Constitution (1971).
 
 
 [5]
 In comparison the reports are filled with a plethora of Supreme Court first amendment free speech cases on other subjects. See, e.g., (1) commercial speech cases--Zauderer v. Office of Disciplinary Counsel, --- U.S. ----, 105 S.Ct. 2265, 85 L.Ed.2d 652; Bates v. State Bar, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Linmark Associates, Inc. v. Township of Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977); Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); (2) defamation cases--Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Beckley Newspaper Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); and (3) obscenity cases--Smith v. United States, 431 U.S. 291, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977); Ward v. Illinois, 431 U.S. 767, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977); Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Ginzberg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966); Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Doubleday & Co. v. New York, 335 U.S. 848, 69 S.Ct. 79, 93 L.Ed. 398 (1948)
 
 
 [6]
 Being of the view that the foregoing discussion is not necessary to the decision in this case, Judge Becker does not join in Part IV
 
 
 [7]
 The holding is not without its critics, even by some members of this court. For an analysis by one member that vigorously supports Justice Powell's dissenting opinion in Elrod, see Loughney v. Hickey, 635 F.2d 1063, 1065 (3d Cir. 1980) (Aldisert, J., concurring)
 
 
 [8]
 Senior Judge Max Rosenn of this court served on the Seventh Circuit's panel by designation and joined in the opinion of the court
 
 
 [9]
 In the case at bar, we are deciding only the matters before us. Thus, we do not meet the emotionally-charged scenario posed at oral argument: Whether the first amendment would protect from politically-motivated discharge an independent contractor with substantial economic dependence on the state, e.g., a one-person shoeshine stand in a public building. We note what has been stated by Justice Rehnquist in a similar context:
 Because the record facts should always establish the limits of the Court's constitutional analysis, and are particularly relevant in cases where the trial court has been granted summary judgment, I think that [any other] approach violates our "long ... considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision." Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461 (1945) (citations omitted).
 ....
 ... [A]s in so many other cases the extreme examples are seldom the ones that arise in the real world of constitutional litigation.
 Board of Education v. Pico, 457 U.S. 853, 905, 907, 102 S.Ct. 2799, 2827, 2828, 73 L.Ed.2d 435 (1982) (Rehnquist, J., dissenting). In vacating a judgment of this court, the Supreme Court has warned about a decision that sweeps beyond record facts:
 Judge Aldisert thought that the court erred in abandoning the common-law method of deciding the case at bar rather than articulating broad principles unconnected with the facts of the case and of uncertain meaning. [Romeo v. Youngberg, 644 F.2d 147, 182-83 (3d Cir.1980) (in banc) ]. And, on a pragmatic level, Judge Aldisert warned that neither juries nor those administering state institutions would receive guidance from the "amorphous constitutional law tenets" articulated in the majority opinion. Id. at 184. See id. at 183-85.
 Judge Garth also ... wrote separately to criticize the majority for addressing issues not raised by the facts of this case. Id. at 186.
 Youngberg v. Romeo, 457 U.S. 307, 314 n. 15, 102 S.Ct. 2452, 2457 n. 15, 73 L.Ed.2d 28 (1982).
 
 
 [10]
 LaFalce v. Houston, 712 F.2d 292 (7th Cir.1983), cert. denied, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984); Fox & Co. v. Schoemehl, 671 F.2d 303 (8th Cir.1982); Sweeney v. Bond, 669 F.2d 542 (8th Cir.), cert. denied sub. nom. Schenberg v. Bond, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982); see also LaFalce v. Houston, No. 82-C-3203 (C.D.Ill. Dec. 3, 1982); Fox & Co. v. Schoemehl, 519 F.Supp. 849 (E.D.Mo.1981); Sweeney v. Bond, 519 F.Supp. 124 (E.D.Mo.1981)
 We reject appellants' argument that McMullan v. Thornburgh, 508 F.Supp. 1044 (E.D.Pa.1981), leads to a different result. In McMullan, a group of Democrats serving as local registrars in the Pennsylvania Department of Health had been dismissed by the incoming Republican administration. The registrars were responsible for the filing of birth and death certificates and for the issuance of building permits. They were compensated on a fee per certificate basis, with a statutory maximum yearly compensation of $20,000. The Commonwealth deducted Social Security contributions from the registrars' compensation and also filled out their W-2 forms. They were covered by the State's Worker's Compensation System and were entitled to State unemployment compensation. Based on these facts, the district court concluded that the discharged registrars were employees and ordered their reinstatement.
 Obviously, McMullan differs from this case. First, there are significant factual dissimilarities. New Jersey has not imposed a compensation ceiling on the motor vehicle agents' yearly compensation. As the district court observed, "unlimited profits is certainly not the hallmark of public employment." 593 F.Supp. at 1303. Furthermore, appellants in this case were not covered by the state's Worker's Compensation program. Second, and more fundamentally, the district court in McMullan declared "[t]he possibility that those persons are not employees within the contemplation of Elrod and Branti is not something which has been pressed by defense counsel...." 508 F.Supp. at 1046. This observation is highlighted by the district court's summary conclusion that the McMullan plaintiffs were "employees" without explanation of the reasoning process that led to that conclusion. Given the factual context and posture in which McMullan was decided, our position is not inconsistent with the outcome in that case.
 
 
 [11]
 The danger ... is that a sort of decisional leapfrogging takes over as a principle expands: the first decision is distilled from the language of the Constitution, but the next expansion begins from the reasoning of the last decision, and so on down the line until we reach a point where the words of the Constitution are so far in the background that they are virtually ignored. In the end we may be left with a rationale that comes to little more than, "Well, it really is a good idea. We want a free society where all of these things can be done...."
 Griswold, The Judicial Process, 31 Fed.Bar J. 309, 317 (1972).
 
 
 [12]
 B. Cardozo, The Nature Of The Judicial Process 72 (1921)
 
 
 [1]
 At least one of the plaintiffs was a full-time motor vehicle agent, and thus was situated, for purposes of economic analysis, no differently than would be an at-will servant. The majority's assumption that independent contractors are less subject to coercion than are servants is therefore of doubtful factual validity. There is no empirical evidence that independent contractors, especially those involved in providing personal services, are as a group less dependent on the government for work than are public servants. Moreover, a discharged servant can count on unemployment benefits in the transition to a private sector job, while an independent contractor bears the entire risk of termination
 
 
 [2]
 The Supreme Court of New Jersey has recognized than an at-will contractual relationship is protected by federally protected liberty interests. See English v. College of Medicine and Dentistry of New Jersey, 73 N.J. 20, 23, 372 A.2d 295, 297 (1977)
 
 
 [3]
 It even protects artificial persons such as corporations. See, e.g., Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557, 561-62, 100 S.Ct. 2343, 2348-49, 65 L.Ed.2d 341 (1980); First National Bank of Boston v. Bellotti, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978)
 
 
 [4]
 For almost eighty years the essentially clerical function of collecting fees for and issuing motor vehicle registrations and licenses in New Jersey has served as a means for diverting to the pockets of the politically favored funds that would otherwise have been deposited in and devoted to the public fisc of New Jersey. While this lawsuit was pending, however, New Jersey abandoned the patronage system of awarding contracts for motor vehicle licensing in favor of a system of competitive bidding. See N.Y. Times, June 12, 1985, at B4, col. 6 (late ed.)